**Case No. 24-4789**
_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**
_____

MONTRAIL BRACKENS, JOSE POOT, TROY MCALLISTER, et al.,

*Plaintiffs-Appellants,*

v.

CITY AND COUNTY OF SAN FRANCISCO and SHERIFF PAUL
MIYAMOTO, in his official capacity,

*Defendants-Appellees.*

On Appeal form the United States District Court
for the Northern District of California

No. 3:19-cv-02724-SK
The Honorable Sallie Kim
_____

**APPELLANT'S OPENING BRIEF**
_____

Yolanda Huang (SBN 104543)
LAW OFFICE OF YOLANDA
HUANG
P.O. Box 5475
Berkeley, CA 94705
(510) 329-2140
yhuang.law@gmail.com

Rachel S. Doughty (SBN 255904)
GREENFIRE LAW, PC
2748 Adeline Street, Suite A
Berkeley, CA 94703
(510) 900-9502
rdoughty@greenfirelaw.com

*Attorneys for Plaintiffs-Appellants*

i

## CERTIFICATE OF INTERESTED PARTIES

This Certificate of Interested Parties is being submitted pursuant to Rule 8.208 of the California Rules of Court on behalf of Appellants the class of all pretrial inmates incarcerated at the San Francisco County Jail located in San Bruno, California. The undersigned certifies that there are no interested entities or persons that must be listed in this Certificate under Rule 8.208.

Dated: 12/4/2024

By: _____

Yolanda Huang

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PARTIES .................................................ii

TABLE OF AUTHORITIES ....................................................................... v

STATEMENT OF RELATED CASES ........................................................ 1

JURISDICTIONAL STATEMENT ............................................................. 2

ISSUES PRESENTED .............................................................................. 3

INTRODUCTION ..................................................................................... 6

PROCEDURAL POSTURE ....................................................................... 9

STATEMENT OF FACTS ....................................................................... 12

   I.   CLASS REPRESENTATIVES ............................................... 12

   II.  EXPERT OPINION ............................................................... 15

       A.   DR. CZEISLER ............................................................. 15

       B.   DEFENDANTS OFFERED NO MEDICAL DOCTOR OR
           EXPERT EVIDENCE ON THE NEED OR IMPACT OF
           SUNLIGHT ON HUMAN PHYSIOLOGY ................................ 20

   III. PHYSICAL FACILITIES ....................................................... 21

       A.   SAN BRUNO JAIL (CJ3) ............................................... 21

       B.   NO TESTIMONY WAS OFFERED SHOWING
           IMPOSSIBILITY ............................................................ 22

   IV. COMMUNITY STANDARDS ................................................. 24

       A.   INTERNATIONAL AND NATIONAL STANDARDS ............... 24

       B.   BUILDING CODE TITLE 24 ............................................ 25

       C.   COMPARISON TO OTHER REGIONAL DETENTION
           FACILITIES/REGIONAL STANDARDS ............................. 26

SUMMARY OF ARGUMENT ................................................................. 28

STANDARD OF REVIEW ...................................................................... 29

ARGUMENT ......................................................................................... 31

   I.   THE "NEED" ELEMENT OF THE NEED-NARROWNESS-
      INTRUSIVENESS TEST HAS BEEN ESTABLISHED .................. 32

II.  THE NARROWNESS-INTRUSIVENESS ELEMENTS MUST NOT BE SO PARSIMONIOUSLY DRAWN AS TO ALLOW CONTINUATION OF THE ONGOING CONSITITIONAL VIOLATION ......................................................................... 33

A.  THE DISTRICT COURT ERRED BY IGNORING THE UNCONTRADICTED EVIDENCE THAT INMATES NEED DAILY ACCESS TO DIRECT SUNLIGHT ................... 35

    1)  Community standards do not allow for a year of deprivation of direct sunlight ................................................ 35

    2)  A one-year delay in remedy is inconsistent CONFLICTS with the accepted AND UNCONTRADICTED testimony of Dr. Czeisler ............... 41

    3)  The one-year of sunlight deprivation is Constitutionally impermissible because it subjects Plaintiffs to likely illness ...................................................... 42

    4)  The evidence does not support the District Court's conclusion that harms began at one year ............................. 48

B.  THE DISTRICT COURT ERRED IN IGNORING THE EVIDENCE THAT PLAINTIFFS NEED ONE HOUR OF SUNLIGHT, DAILY. ..................................................................... 48

    1)  Community standards cited by the District Court support one hour of sunlight exposure daily ........................ 49

    2)  The District Court does not explain the basis for its paltry 15 minutes per day of direct sunlight ........................ 51

C.  AN ORDER OF ONE HOUR OF SUNLIGHT DAILY, WITH NO MORE THAN A THREE-DAY DELAY IS CONSISTENT WITH THE NARROWNESS-INTRUSIVENESS ELEMENTS OF THE PLRA STANDARD AND IS WARRANTED BY THE TRIAL EVIDENCE .................................................................. 52

CONCLUSION ................................................................. 57

ADDENDUM .................................................................. 60

CERTIFICATE OF SERVICE .......................................... 62

iv

## TABLE OF AUTHORITIES

**Cases**

*Armstrong v. Brown*, 768 F.3d 975 (9th Cir. 2014) ........................................ 53

*Armstrong v. Newsom*, 58 F.4th 1283 (9th Cir. 2023) .............................. 31, 32

*Armstrong v. Schwarzenegger*, 622 F.3d 1058 (9th Cir. 2010).......... 30, 32, 53

*Ball v. LeBlanc*, 792 F.3d 584 (5th Cir. 2015) ................................................ 33

*Benjamin v. Fraser*, 343 F.3d 35 (2d Cir. 2003) ............................................ 54

*Benjamin v. Jacobson*, 172 F.3d 144 (2d Cir. 1999)...................................... 31

*Bonhiver v. Rotenberg Schwartzman*, 461 F.2d 925 (7th Cir. 1972) ........................................................................................................ 51

*Brown v. Mitchell,* 327 F. Supp. 2d 615 (E.D. Va. July 28, 2004) ................ 46

*Brown v. Plata*, 563 U.S. 493 (2011) ......................................................passim

*Carroll v. DeTella,* 255 F.3d 470 (7th Cir. 2001) .......................................... 46

*Carter v. Smith*, 2015 WL 4322317, at *7 (N.D. Cal. July 15, 2015) ........................................................................................................ 45

*Castro v. City of Los Angeles,* F.3d 1060 (9th Cir. 2016) .............................. 38

*Cent. Delta Water Agency*, 653 F. Supp. 2d, 1066 (2009) ............................. 39

*City of Fresno v. Clovis Unified Sch. Dist.*, 204 Cal. App. 3d 417 (1988)........................................................................................................ 39

*City of San Diego v. Shapiro*, 228 Cal. App. 4th 756 (2014)......................... 39

*Crawford v. Coughlin,* 43 F. Supp. 2d 319 (W.D.N.Y. 1999) ....................... 46

*Demery v. Arpaio* 378 F.3d 1020 (9th Cir. 2004) ......................................... 57

*Doyle v. Coombe,* 976 F. Supp. 183 (W.D.N.Y. 1997)................................... 45

*Fed. Trade Comm'n v. Garvey*, 383 F.3d 891 (9th Cir. 2004) ....................... 30

*Georgia Advocacy Office. v. Jackson*, 33 F.4th 1325 (11th Cir. 2022) ................................................................................................... 34, 52

*Gilmore v. People of the State of California,* 220 F.3d 987 (9th Cir. 2000).................................................................................................. 34

*Gonyer v. McDonald*, 874 F. Supp. 464 (D. Mass. Feb. 1, 1995).................. 45

*Grizzle v. Cty. of San Diego,* Case No.: 3:17-cv-00813-JLS-RBM (S.D. Cal. Jul. 10, 2020) ............................................................... 38, 39

*Handberry v. Thompson*, 446 F.3d 335 (2d Cir. 2006) .................................. 54

*Helling v. McKinney,* 509 U.S. 25 (1993) ............................................... passim

*Hoptowit v. Ray*, 682 F.2d 1237 (9th Cir. 1982) ........................................ 34

*Hutto v. Finney*, 437 U.S. 678 (1978) ...................................................... 44

*In re Korean Air Lines Co., Ltd.*, 642 F.3d 685 (9th Cir. 2011) ................... 30

*Inmates of Riverside County Jail v. Clark,* 144 Cal.App.3d 850 (4th DCA, 1983) ........................................................................ 40

*Kenyon Norbert v. City and County of San Francisco*, No. 20-15341 (9th Cir. 2021) .................................................................... 1

*Lewis v. Casey*, 518 U.S. 343 (1996) ......................................................... 34

*Masonoff v. DuBois*, 899 F. Supp. 782 (D. Mass. Sep. 11, 1995) .................. 46

*Melendres v. Maricopa County*, 897 F.3d 1217 (9th Cir. 2018) ................... 35

*Milliken v. Bradley*, 433 U.S. 267 (1977) ................................................. 33

*Morales Feliciano v. Calderon Serra*, 300 F.Supp.2d 321 (D.P.R. 2004) ............................................................................ 52

*Native Ecosystems Council v. Marten*, 883 F.3d 783 (9th Cir. 2018) ........................................................................... 30

*Norbert v. City & Cty. of S.F.*, 10 F.4th 918 (9th Cir. 2021) ...................... 10

*Oluwa v. Gomez*, 133 F.3d 1237 (9th Cir. 1998) ....................................... 31

*Oregon Natural Res. Council v. Marsh*, 52 F.3d 1485 (9th Cir. 1995) ........................................................................... 30

*Pierce v. Cty. of Orange*, 526 F.3d 1190 (9th Cir. 2008) ............................ 33

*Rabkin v. Oregon Health Sciences Univ.*, 350 F.3d 967 (9th Cir. 2003) ........................................................................... 30

*Randles v. Singletary*, 2001 WL 1736881, (M.D. Fla. Aug. 10, 2001) ........................................................................... 46

*Romero v. Garland*, 7 F.4th 838 (9th Cir. 2021) ...................................... 30

*Swain v. Junior*, 961 F.3d 1276 (11th Cir. 2020) ..................................... 52

*United States v. Washington*, 853 F.3d 946 (9th Cir. 2017) ....................... 29

*Wallis v. Baldwin*, 70 F.3d 1074 (9th Cir. 1995) ........................... 45

*Williams v. Illinois*, 567 U.S. 50 (2012) ....................................... 51

**Statutes**

18 U.S.C. §3626(a)(1) .................................... 30, 31, 33, 52

28 U.S.C. §1291 ....................................................... 2

28 U.S.C. §1331 ....................................................... 2

28 U.S.C. §1343(a)(3). ................................................ 2

42 U.S.C. §1983 ....................................................... 2

Cal. Health & Safety Code §18938(b) ......................... 26, 37

Cal. Health & Safety Code §18941.5 .......................... 26, 37

Cal. Penal Code §4015 ........................................ 26, 37

**Regulations**

15 Cal. Code Regs. §1006 ................................. 21, 37, 40

24 Cal. Code Regs. §1231.2.10 ...................... 25, 26, 37, 38

**Rules**

Fed. R. App. P. 4(a)(4)A)(iii) ..................................... 2

Fed. R. App. P. 54(d)(2) ........................................... 2

Fed. R. App. P. 59 ................................................. 2

Fed. R. Civ. Proc. 25(d) ........................................... 9

Fed. R. Civ. Proc. 52 ............................................. 51

Fed. R. Civ. Proc. 65 ............................................. 52

Fed. R. Evid. 605 ................................................. 51

## STATEMENT OF RELATED CASES

There are no related cases currently pending before this Court. However, this case has been before this Court previously when Defendants appealed the preliminary relief won by Plaintiffs; Plaintiffs cross-appealed for more expansive preliminary injunctive relief. *Kenyon Norbert v. City and County of San Francisco*, 10 F.4th 918, 921 (9th Cir. 2021). On August 26, 2021, the appellate panel dismissed Defendants' appeal as moot, and rejected Plaintiffs' arguments for a broader preliminary injunction.

# JURISDICTIONAL STATEMENT

Plaintiffs-Appellants brought this action pursuant to 42 U.S.C. §1983 to enforce their rights protected by the Fourteenth Amendment to the United States Constitution and Article I, Section 7 of the California Constitution. As such, the District Court (Kim, J.) had subject matter jurisdiction under 28 U.S.C. §§1331 and 1343(a)(3). A final judgment was entered in partial favor of Appellants on October 17, 2023. The District Court granted the parties' joint motion that Plaintiffs' timely-filed motion for attorney's fees, made under Rule 54(d)(2), should have the same effect under Federal Rule of Appellate Procedure 4(a)(4)A)(iii) as a timely motion under Rule 59, so that all parties' time to file an appeal ran from the entry of the order disposing of Plaintiffs' motion. (ECF-492) The Court's Order on Plaintiffs' fee motion was entered on July 2, 2024. (ECF-522) Appellants timely filed their notice of appeal on July 30, 2024. (ER-1366). This Court has jurisdiction under 28 U.S.C. §1291.

## ISSUES PRESENTED

Plaintiffs-Appellants brought this class action suit asserting that the Defendants-Respondents have violated the Fourteenth Amendment to the United States Constitution and sections 7 and 17 of Article I of the California Constitution by failing to provide pretrial inmates at the San Francisco County Jail #3 ("CJ3"), located in San Bruno, California, with any outdoor access to direct sunlight.

From 2006, when the San Francisco City and County opened CJ3, until the trial, all pretrial inmates have been denied all access to direct sunlight. Over 40% of the pretrial inmate population have been in custody at CJ3 for one or more years. Class representative Montrail Brackens has been in custody for over a decade; Class representative Troy McAlister has been in custody for three years; Class representative Jose Poot has been incarcerated for over six years.

The uncontroverted evidence presented by Plaintiffs at the bench trial for this action established that chronic deprivation of sunlight is a causal factor for an increase in all-cause mortality, and further, such deprivation was a causal factor in the illnesses that Plaintiffs developed while incarcerated in CJ3. These illnesses include high blood pressure, diabetes, myopia, and weight gain/obesity.

To avoid physical harm to Plaintiffs, the uncontroverted evidence also established that pretrial inmates should receive a minimum of one hour of direct

3

sunlight daily. Further, this provision of sunlight should begin within days of incarceration.

Following the bench trial, the District Court found that Plaintiffs prevailed on their claim that complete denial of exposure to direct sunlight is a violation of the Fourteenth Amendment and Article I, Section 7 of the California Constitution, agreeing that the evidence established chronic deprivation of sunlight is a causal factor for an increase in all-cause mortality and that humans require daily access to sunlight.

The remedy fashioned by the Court orders Defendants to offer all CJ3 inmates who have been incarcerated for longer than a year daily access to direct sunlight for at least 15 minutes. In so doing, the District Court ignored the uncontroverted evidence that pretrial inmates should receive a minimum of one hour access to sunlight each day and should not be denied sunlight exposure for more than a few days after their arrival at CJ3. Neither Plaintiffs nor Defendants presented evidence that supports the remedy crafted by the Court.

Plaintiffs-Appellants appeal the Court's order only as regards to the remedy. The issues presented are:

1. Did the District Court abuse its discretion in crafting a remedy so narrowly tailored that the remedy does not eliminate the violations of the Fourteenth

Amendment of the United States Constitution Article I, Section 7 of the California Constitution because the remedy:

    a.  causes serious harm to the class members' health by permitting Defendants to deprive all class members total access to direct sunlight for a year during which time serious illnesses develop; and,

    b.  continues the unreasonable risk of future chronic and irreversible illnesses and an increase in all-cause mortality to all class members because the District Court's remedy only requires access to direct sunlight for an insufficient fifteen minutes daily, after a year of total deprivation?

2. Are the District Court's decisions to deny all class members any access whatsoever to direct sunlight for one year, and then to only require that class members receive a scant 15 minutes a day of direct sunlight, clearly erroneous, when such decision was not based upon nor supported by the evidence?

## INTRODUCTION

Plaintiffs are a class of all pretrial detainees incarcerated at San Francisco County Jail 3 ("CJ3") in San Bruno, California. All class members have not for an instant, felt the warmth of direct sunlight on their skin in years. Not days. Not weeks. Not months. Years. This is because they are confined continuously indoors. Plaintiff Montral Brackens had not at the time of trial been permitted outside in 11 years; Jose Poot in seven years; and Troy McAlister in approximately three years. The District Court found that "the lack of direct sunlight was a causal factor in high blood pressure, diabetes, myopia, and weight gain in Plaintiffs" in violation of their Fourteenth Amendment rights and Article I, Section 7 of the California Constitution. (1-ER-0066:1-3) The Court also found that Defendants the City and County of San Francisco and the San Francisco Sheriff Miyamoto, lacked a "rational reason for failing to provide outdoor access." (1-ER-0069:7-8) The Court held finally that "[b]ased on the physical harm caused by lack of access to direct sunlight and lack of rational reason for Defendant's [sic] denial of that access, Plaintiffs prevail on their claim that complete denial of exposure to direct sunlight is a violation of the Fourteenth Amendment and Article I, Section 7 of the California Constitution." (1-ER-0071:12-15).

In this appeal, Plaintiffs challenge only the District Court's remedy, which is wholly inadequate because it does not rectify the constitutional violations. The

District Court ordered no relief whatsoever to Plaintiffs incarcerated for less than a year—57.5% of the class–and during this one year time, these pretrial inmates suffer cruel and unusual punishment because the deprivation of sunlight causes chronic and irreversible harm to their health and increases their risk of all-cause mortality—a risk Plaintiffs' expert placed on par with cigarette smoking. After this year of total deprivation of direct sunlight, the District Court ordered Defendants to offer to each inmate just 15 minutes of direct sunlight a day. Fifteen minutes is insufficient exposure to stave off the ill health effects that the Court itself found result from sunlight deprivation.

The District Court abused its discretion, erring because the District Court: (1) ignored key uncontradicted testimony of Appellants' expert witness Dr. Czeisler that exposure to sunlight must be daily; (2) ignored recommendations of both the U.S. Marshall's Federal Performance Standards and the American Correctional Association which recommend a full hour of outdoor access per day (as well as international standards); and (3) ignored the Defendants' own building code requirements for inmates held over 96 hours. The uncontradicted evidence in the record supports immediate daily access to sunlight. Yet; the Court's remedy permits Defendants to deny pretrial inmates sunlight for a full year. This decision is in error and should be reversed. And the limited amount of sunlight ordered by the District Court after a year of total deprivation of sunlight--a mere 15 minutes

7

per day--does not rectify the constitutional harm, and is insufficient to repair the injuries. The District Court's remedy should be remanded with instructions to enter an order requiring Defendants to provide all inmates one hour of outdoor sunlight, daily, with no prior deprivation period permitted.

## PROCEDURAL POSTURE

Plaintiffs brought this class action suit seeking, relevant to this appeal and among other things, declaratory and injunctive relief, asserting that the City and County of San Francisco and Sheriff Miyamoto,[1] through their actions, have violated the Fourteenth Amendment to the United States Constitution and sections 7 and 17 of Article I of the California Constitution (due process of law and prohibition on cruel and unusual punishment, respectively).[2] ("Complaint," 6-ER-1341)

The District Court certified as a class, relative to this appeal,

> All inmates who are pretrial detainees and have been incarcerated in San Francisco County Jail 3 (formerly known as County Jail 5) located in San Bruno, California, at any point during the time period May 20, 2017 to the present, and who do not have outdoor access as part of their incarceration at San Francisco County Jail 3.

(5-ER-1044 to 5-ER-1047)

The District Court granted preliminary relief to Plaintiffs on January 31, 2020, stating, relevant to this appeal, that "depriving a pretrial detainee of lack of

---

[1] The defendants remaining in the case are the City and County of San Francisco (of which the Sheriff's Office is deemed by this court to be a non-jural entity (5-ER-1118), and Sheriff Miyamoto, in his official capacity. Sheriff Miyamoto is automatically substituted for his predecessor in interest, former Sheriff Hennessy. Fed. R. Civ. Proc. 25(d).

[2] Plaintiffs' complaint originally included claims under the 8th Amendment to the U.S. Constitution, which were dismissed. (6-ER-1341).

access to direct sunlight for more than four years constitutes punishment." (5-ER-1126:13-15) The District Court noted that "San Francisco created the problem at issue by deliberately constructing a jail without access to direct sunlight." (5-ER-1106:10-13) And it held that "the Court finds that confining a pretrial detainee, an innocent person, in such a situation where he does not see direct sunlight for years is not rationally related to the non-punitive nature of confinement and violates the Fourteenth Amendment." (5-ER-1107:5-7) The District Court later clarified its ordered preliminary relief to make clear that direct sunlight is "not filtered through a windowpane." (1-ER-0005:4-5)

Plaintiffs appealed the January 2020 Order seeking greater preliminary relief. This 9th Circuit Court of Appeal declined to expand the preliminary relief, holding that at the time of the preliminary injunction, "plaintiffs and their expert had not demonstrated a risk of material harm to human health arising from the light exposure in [CJ3]."[3] *Norbert v. City & Cty. of S.F.*, 10 F.4th 918, 921 (9th Cir. 2021). This Court did not preclude future modification of the remedy afforded upon further development of the evidence.

---

[3] The totality of the health data available to this Court at the time of review of the preliminary relief was a three-page expert report from Dr. Jaime Zeitzer regarding interruption of circadian rhythms, but not the other human health aspects of sunlight exposure upon which the Court ultimately based its finding that Plaintiffs had not yet met their burden of identifying a risk of harm from being denied time out of doors. *Norbert*, 10 F.4th at 923-924.

10

A trial in this case was held on seven days in August 2023 in which the Court heard further evidence on (1) the material risk to human health arising from the deprivation of sunlight on skin, (2) the material risk to human health as a result of interruption of circadian rhythms, (3) the current conditions at CJ3, including the complete lack of opportunities for recreation indoors, (4) further information about the physical structure of CJ3, including the windows and the gyms, (5) the outdoor spaces available at the San Bruno parcel where CJ3 is located, and (6) the past utilization of those outdoor spaces.

The District Court granted Plaintiffs requested Judicial Notice of certain portions of the U.S. Marshalls Service's *Federal Performance Based Detention Standards Handbook* (Rev. 11, May 2022) (2-ER-0234:G.6.1); the European Committee for the Prevention of Torture and Inhuman or Degrading Treatment or Punishment, Council of Europe ("CPT"), *30th General Report of the CPT* (May 2021) (2-ER-0279:80); The CPT's Imprisonment, Extract from the 2nd General Report of the CPT (1992) (2-ER-0307:48); and the American Correctional Association ("ACA"), *Performance-Based Standards and Expected Practices for Correctional Institutions* (5th Ed., March 2021) (2-ER-0332) The District Court cited these materials in its Findings of Fact and Conclusions of Law. (1-ER-0070)

Additionally, the District Court took judicial notice of the standards in Title 24 of the California Building Code, requiring outdoor exercise space for Type II

facilities, in its Order on Summary Judgment, and also cited Title 24 as evidence of a community standard in its Findings of Fact and Conclusions of Law. (5-ER-0985:23 to 5-ER-0986:2; 1-ER-0069:14-25)

The District Court concluded that "standards in the community show that Defendant's actions are not rational and not reasonably related to a valid penological purposes." (1-ER-0069:14-15)

## STATEMENT OF FACTS

### I.    CLASS REPRESENTATIVES

Plaintiffs are all of the pretrial detainees incarcerated in CJ3 who have not been adjudicated as guilty. (1-ER-0011) CJ3 houses hundreds of pretrial detainees. As of August 2022, 57.5% of class members had been in custody for one year or less, 19.9% for between one and two years, 6.5% between two and three years, 3.3% between three and four years, and 12.5% for four years or more. (1-ER-0018:14-27)

The three named Plaintiffs/class representatives–Montrail Brackens, Troy McAlister and Jose Poot–are all pretrial detainees in San Francisco's only jail, "CJ3," in San Bruno. (1-ER-0011)

Plaintiff Montrail Brackens was incarcerated in December 2012 at the age of 20. (7-ER-1636:12-13) At the time of the trial, he had been incarcerated for approximately 11 years. (1-ER-0011:23) Mr. Brackens' medical records reflect

disease and disorder associated with lack of sunlight, specifically, a trend toward obesity, high blood pressure, metabolic and digestive disorders that have developed into severe insulin dependent diabetes, hypertension and chronic Vitamin D deficiency. (1-ER-0039-0040) Starting in December 2014, Mr. Brackens' medical records show that his blood pressure was high for a person of his age. (1-ER-0039; 1-ER-0065:17-18) Although a young man in his early twenties, Mr. Brackens exhibited obesity and weight issues two years into his incarceration. (1-ER-0040) At the same time he began reporting chronic headaches. (1-ER-0040) Mr. Brackens reports multiple headaches a week to this day. (1-ER-0040:12-18) In addition, the Court also noted that Mr. Brackens developed myopia. (1-ER-0040:19-20)

Plaintiff Troy McAlister had been incarcerated on his pending criminal charges for approximately three years at the time of trial.[4] (1-ER-0011:25-26) Mr. McAlister developed high blood pressure while incarcerated in the San Francisco County Jail. (1-ER-0065:17-18) As documented in his medical records, in 2009, while incarcerated in a San Francisco County Jail, where he had no access to sunlight, Mr. McAlister developed high blood pressure while in custody and was prescribed blood pressure medication. (1-ER-0043:7-20; 8-ER-1725:9-13) Mr.

---

[4] Mr. McAlister had previously been incarcerated by the Defendants as well. (1-ER-0042:12-21)

13

McAlister testified that following his release from San Francisco County Jail he had ample access to the outdoors and direct sunlight. (8-ER-1719:9 to 8-ER-1722:23) His medical records indicate that his blood pressure returned to normal after his discharge from San Francisco County Jail. (1-ER-0043:10-11) However, following McAlister's reincarceration in 2015, he developed rapid weight gain accompanied with significant hypertension within 6 months of his 2015 incarceration. (1-ER-0043:15-21) Mr. McAlister has remained hypertensive since his 2015 incarceration. (8-ER-1724:23 to 8-ER-1725:5) The metabolic disorders also included digestive issues, which appeared eight months into his 2015 incarceration. (1-ER-0044:5; 8-ER-1724:1-5)

Jose Poot is a Spanish speaker and required a translator to testify at trial. (7-ER-1578) At the time of trial, he had been in custody for seven years. (1-ER-0011:24-25) Jose Poot weighed 133 pounds when he was first incarcerated in 2016. (1-ER-0037:13) And since being incarcerated, he has gained 50 pounds, even though he has low appetite. (1-ER-0037:13; 7-ER-1584:13-17) He also testified that he has headaches "always" at an eight on a scale from one to ten. (1-ER-0037:15-16; 7-ER-1585:1-10) He has tested low for Vitamin D. (1-ER-0037; 7-ER-1585:20-25) He had trouble sleeping, waking up three or four times a night. (7-ER-1589:21 to 7-ER:1590:12) Nervousness woke him up quite a bit at night. (7-ER-1591:14-23) He testified that he has problems with his memory, that at times

14

he forgets the date, or the names of people who live with him in his housing unit, and that he gets very confused. (7-ER-1586:1-12)

## II.   EXPERT OPINION

### A.   DR. CZEISLER

Dr. Charles Czeisler has a PhD in Neuro- and Behavioral Sciences and a degree of Medical Doctor from Stanford University. (1-ER-0052:1-2) Dr. Czeisler is one of the foremost authorities in the United States on sleep medicine, sleep disruption, and the effect of sunlight on human physiology. (1-ER-0052:1-18) He is the Baldino Professor of Sleep Medicine and the Director of the Division of Sleep Medicine at Harvard Medical School. (1-ER-0052:4-7) He is also the Chief of the Division of Sleep Medicine in the Department of Medicine at Brigham and Women's Hospital in Boston, Massachusetts where he is also the Division Chief for both the Department of Medicine and the Department of Neurology at the hospital. (1-ER-0052:4-11) The Court found Dr. Czeisler's testimony to be credible. (1-ER-0054:1)

Dr. Czeisler testified on the role and importance of sunlight on human skin, and that insufficient sunlight exposure leads to illness and an increase in all-cause mortality equivalent to smoking. (8-ER-1812; 1-ER-0008) Sunlight on skin converts nitric oxide derivatives and causes the blood vessels to relax which lowers blood pressure, an effect that persists for 24-hours. (1-ER-0052:19-22; 8-ER-

15

1811:20-25) This is "one of the major mechanisms by which all-cause mortality is increased in individuals who get insufficient sunlight. And the effects are not small. In fact, it's thought—estimated to be equivalent to the impact of smoking." (8-ER-1812:1-5) Deprivation of direct on-skin sunlight exposure increases the risk of colorectal and breast cancer, ulcerative colitis, and bowel problems. (1-ER-0052:19-28; 8-ER-1811) Low or insufficient exposure to sunlight also gives rise to inflammation in the body, and inflammation, in addition to hypertension, is thought to be the causal pathway to cardiovascular disease. (1-ER-0052:4-5; 8-ER-1815) Insufficient exposure to sunlight, also contributes to the constellation of symptoms defined as "metabolic syndrome": obesity, diabetes, and hyperglycemia (high blood sugar). (8-ER-1814) Sunlight deprivation contributes to neurological diseases as well, such as dementia, memory loss, Alzheimer's, and autism. (1-ER-0053:5-6; 8-ER-1810)

The District Court noted:

> Czeisler testified that the lack of access to direct sunlight is a leading cause of "all cause" mortality. He also opined that lack of access to direct sunlight led to the specific complaints that Plaintiffs made in the Complaint. In the Complaint, Plaintiffs alleged that the conditions of confinement caused cardiovascular disease, hypertension, negative impacts on blood sugar including adult onset diabetes and lowered insulin sensitivity, headaches, migraines, anxiety and depression, weight increase and obesity." (Dkt. No. 1 at ¶ 52.) Additionally, Plaintiffs alleged that they were deficient in Vitamin D and thus suffer from a "variety of health issues resulting from Vitamin D deficiency, including soft bones, muscle weakness, bone pain,

16

cardiovascular disease and cognitive impairment (inability to think clearly and analyze logically). (*Id.* at ¶ 53.) As noted above, all three Plaintiffs (Brackens, McAlister, and Poot) gained a substantial amount of weight while incarcerated. Also, two of the three (Brackens and McAlister) developed high blood pressure while incarcerated. McAlister's blood pressure went down when he was incarcerated at San Quentin, where he had access to an outside exercise yard. Brackens developed diabetes, and he also became nearsighted while incarcerated. Two of the three (Brackens and Poot) developed significant headaches while incarcerated, but the Court finds Poot not to be credible on this issue because he never sought medical treatment for headaches and because he has general problems with credibility, as noted above.

Czeisler explained the specific mechanism in which lack of exposure to ultraviolet light, which cannot pass through glass or plastic, creates a physical problem; thus, he explained the pathophysiology which Mayer states is necessary to establish causation. Czeisler specifically pointed to epidemiological studies about lack of exposure to sunlight. Although Mayer claimed that there were no studies showing the links that Czeisler claimed, he did not refute any specific study that Czeisler cited.

For these reasons, the Court accepts Czeisler's opinions on this issue and finds that the lack of direct sunlight was a causal factor in high blood pressure, diabetes, myopia, and weight gain in Plaintiffs.

(1-ER-0065:7 to 1-ER-0066:3)

Dr. Czeisler testified that humans need to be exposed to sunlight daily. (1-ER-0053:7, 24; 8-ER-1872:10-11) He testified that he is aware of no functional equivalent to sunlight in terms of the effect of sunlight on the skin. (8-ER-1831)

Dr. Czeisler testified that Vitamin D supplementation does not alleviate the

majority of health problems caused by lack of sunlight. (1-ER-0053:12-18; 7-ER-1488) For example, Vitamin D supplements do not resolve the increase in all-cause mortality resulting from sunlight deprivation. (1-ER-0053:15-16) Vitamin D is a *marker* for inadequate sunlight exposure but is "not the *mediator* of those adverse effects on cardiovascular disease, all-cause mortality." (8-ER-1813:22 to 8-ER-1814:2 (emphasis added); 1-ER-0053:12-15) As the level of vitamin D in the blood drops, indicating insufficient exposure to sun, all-cause mortality increases. (8-ER-1813:8-12).

Dr. Czeisler testified that it would be reasonable in an experiment to assign people to total sunlight deprivation for a brief period—on the order of three days, not months or years. (8-ER-1821:4-10) Dr. Czeisler's expert opinion is derived from epidemiological and associational studies—not from intentionally designed studies in which participants were intentionally deprived of sunlight for the purpose of the study. (8-ER-1811 to 8-ER-1812)

Studies assigning participants to fully deprive themselves of sunlight would be unethical as it "would not be reasonable to assign people to be denied access to sunlight for months or years." (8-ER-1822) Accordingly, Dr. Czeisler has never conducted studies where individuals were purposefully deprived of access to the sun's rays on their skin. (8-ER-1828:7-9) Dr. Czeisler compared the ethics of testing by denying people access to sunlight, with testing to establish the harms of

18

smoking. (8-ER-1812:3-5) For similar ethical reasons, in either situation, studies assigning participants to harmful behavior cannot be used: "you can't assign 100,000 people to smoke for 20 years and have another group who don't smoke". (8-ER-1815 to 8-ER-1820)

Because Dr. Czeisler opined that it would be unethical to conduct an experiment depriving humans of sunlight exposure, and because when he first reviewed this case and was informed that the inmates *never* were provided with access to sunlight, he had difficulty accepting or comprehending such circumstances. He found it "inconceivable…that people would be held for years in the United States without the ability to be exposed to outdoor light." (8-ER-1808:14-23) Earlier studies he had conducted, which lasted from a couple of weeks to four weeks, maximum, "were done before it was recognized that deprivation of sunlight had these adverse biological and medical effects." (8-ER-1823:1-6)

"[P]eople need to get direct sunlight every day." (1-ER-0053:24; ER-8-1875:13 (Czeisler's testimony)) Indeed, the Court accepted the "need for daily access to direct sunlight" as a "given" based on Dr. Czeisler's testimony. (1-ER-0072:10-11) Dr. Czeisler also testified to that one hour is an appropriate amount of daily access to sunlight. (8-ER-1870:9) However, the District Court struck this testimony because it said this opinion was not in Dr. Czeisler's report. (8-ER-1870:12-16)

## B. DEFENDANTS OFFERED NO MEDICAL DOCTOR OR EXPERT EVIDENCE ON THE NEED OR IMPACT OF SUNLIGHT ON HUMAN PHYSIOLOGY

Defendants proffered no expert on the impact of sunlight on human physiology nor on the human need for direct sunlight. Defendants proffered two medical experts: a psychiatrist, Dr. Michael Roger and an epidemiologist-biostatistician-public health expert, Dr. Stephen Mayer. The Court found that Dr. Mayer was not credible, nor was he an expert on the impact on human physiology of the deprivation of sunlight. (1-ER-0054:28 to 1-ER-0055:1) Furthermore, his testimony was "simply too vague to contradict Czeisler's opinions. (1-ER-0055:20-21) The District court found that Dr. Rogers, as a psychiatrist, was credible, however, he "did not attempt to opine on the effects of deprivation of sunlight on medical issues (the diseases Czeisler noted). (1-ER-0059:1-4)

Defendants offered no evidence on the amount of sunlight humans require. There was no defense evidence on the frequency of sunlight exposure required by humans. There was no defense evidence on the length of time humans can be denied access to sunlight before adverse health effects manifest. Defendants offered no evidence to counter Plaintiffs' evidence that humans require sunlight daily, that intentional deprivation of sunlight for more than three days would be unreasonable, or that the recommended amount of daily sunlight to protect human health is one hour.

20

### III.    PHYSICAL FACILITIES

### A.    SAN BRUNO JAIL (CJ3)

San Francisco County Jail ("CJ3") was inaugurated in 2006. (1-ER-0012:19)

CJ3 is designated by the California Board of State Community Corrections

("BSCC") as a Type II Facility: "a local detention facility used for the detention of

persons pending arraignment, during trial and upon a sentence of commitment."[5]

24 CCR §1231.1. (1-ER-0012:5-6) It is uncontroverted that CJ3 was designed and

constructed with no outdoor space for detainees. (1-ER-0012:19) From its 2006

opening until August 2022,[6] the Sheriff's Office did not offer outdoor space for the

use of inmates at CJ3. (1-ER-0012:20-21)

The City and County of San Francisco owns the land where CJ3 is sited -

approximately 242 acres. (1-ER-0012:13) CJ3 replaced a historic jail, which was

---

[5] Title 24 identifies four types of local detention facilities: Type I refers to "a local detention facility used for the detention of persons, for not more than 96 hours, excluding holidays, after booking." Type II refers to "a local detention facility used for the detention of persons pending arraignment, during trial and upon a sentence of commitment." Type III refers to "a local detention facility used only for the detention of convicted and sentenced persons." Type IV refers to "a local detention facility or portion thereof designated for the housing of inmates eligible under Penal Code Section 1208 for work/education furlough and/or other programs involving inmate access into the community." 15 Cal. Code Regs §1006.

[6] Fact discovery was cut off on August 19, 2022. (ECF 247) As a result, the District Court invited consideration of conditions at CJ3 after August 2022 at the pretrial conference, but only if the parties agreed, which they did not. (ECF 384)

also located at the Moorland Drive, San Bruno property. The old jail was activated in 1934 and operated for seven decades ("1934 Jail"). The property where CJ3 is located contains the area formerly used as an outdoor exercise yard, which is approximately the size of one and a half football fields located approximately 300 feet from the current CJ3. (1-ER-0012:13-18) The footprint of the 1934 Jail remains visible. (10-ER-2244: 21-24) The fencing for the San Bruno Yard also remains. (10-ER-2246:1-2; *accord* Miyamoto, 9-ER-1922:9 to 9-ER-1923:18)

## B. NO TESTIMONY WAS OFFERED SHOWING IMPOSSIBILITY

The District Court Properly found that:

> Defendant provides no real reason why it cannot build an exercise yard for outdoor exercise that would allow inmates access to direct sunlight. Defendant relies upon tautological reasoning: it created the problem by building a jail without a secured outdoor exercise yard and then relies upon that problem to claim that it cannot provide a secure way for inmates to have access to direct sunlight. This type of tautological reasoning does not show a rational reason for failing to provide outdoor access.

(1-ER-0069:3-8)

It is undisputed that Defendants had control over the design and construction of CJ3 and made the decision to construct a jail without providing outdoor access. (7-ER-1486:23 to 7-ER-1487:4) It is undisputed that Defendants have the ability to provide outdoor access to inmates at CJ3. (7-ER-1486:5-16; 7-ER-1486:23 to 7-

ER-1487:4; 7-ER-1487:11 to 7-ER-1488:15; 7-ER-1492:12 to 7-ER-1493:4; 9-ER-1924:6-10)

The Annex (CJ6) is still at 1 Moreland Drive, and the outdoor patios are still in existence. (9-ER-2088:24 to 9-ER-2090:1) The San Bruno Yard remains and it historically could hold up to 200 inmates at a time, monitored by four deputies. (10-ER-2254:3-13) Inmates at the 1934 Jail, including both pretrial detainees and individuals convicted of criminal offenses were allowed into the San Bruno Yard to have outdoor exercise, including softball and volleyball. (7-ER-1487:11 to 7-ER-1488; 9-ER-1994:3-15; 10-ER-2254:23-24; 10-ER-2226:2-3; 10-ER-2254:5-13) Inmates at the 1934 Jail generally had access to the outdoor area during daytime hours, usually from mid-morning through early afternoon. When weather was bad, there would still be the option for inmates to go outside, unless there was something that could become a safety risk for individuals outside. (9-ER-2055:12 to 9-ER-2056:22) The San Bruno Yard had a volleyball net and a softball field.

Chief Deputy Sheriff Tilton testified he enjoyed assignment on the yard. (10-ER-2224:15 to 10-ER-2225:1) Sheriff Miyamoto testified that he agreed "that incarcerated people should have access to at least one hour of outdoor time each day, weather permitting". (9-ER-2001:18-21) Chief Deputy Sheriff Tilton testified that reconfiguring and improving the San Bruno Yard is an option. (10-ER-2255:3-10)

23

IV.    COMMUNITY STANDARDS

A.    INTERNATIONAL AND NATIONAL STANDARDS

As noted above, the District Court granted judicial notice of, and then drew text from four documents evincing national and international standards relating to inmates' access to the outdoors, each recommending that inmates receive at least one hour of outdoor access.

The 1992 Second General Report of the European Committee for the Prevention of Torture and Inhumane or Degrading Treatment or Punishment (CPT) states, "The requirement that prisoners be allowed at least one hour of exercise in the open air every day is widely accepted as a basic safeguard (preferably it should form part of a broader programme of activities)." (2-ER-0306 to 2-ER-0307)

The 2020 Thirtieth General Report of the CPT recommends "minimum of access to one hour's daily outdoor exercise and/or time in the open air, and two hours in the case of juvenile inmates. This remains a fundamental right for all prisoners, including during the COVID-19 pandemic." (2-ER-0279:80)

The 2021 Fifth Edition Performance-Based Standards and Expected Practices for Adult Correctional Institutions by the American Correctional Association (ACA) states, "Both outdoor and covered/enclosed exercise areas for general population inmates are provided in sufficient number to ensure that each inmate is offered at least one hour of access daily. Use of outdoor areas is

24

preferred, but covered/enclosed areas must be available for use in inclement weather." (2-ER-0332 to 2:ER-0333)

The U.S. Marshalls Service's 2022 Federal Performance Based Detention Standards Handbook states, "Prisoners have access to exercise opportunities and equipment, including at least one-hour daily of physical exercise outside the cell and outdoors, when weather permits. (Access to the housing unit's dayroom does not satisfy the standard's requirement.)" (2-ER-0234:§G.6.1)

The District Court's Findings of Fact noted that the American Correctional Association's Fifth Edition recommends "at least one hour of access daily" for outdoor and indoor exercise (1-ER-0070:3-8), and its Fourth Edition, contained a similar provision, adopted by the U.S. Marshal Service. (1-ER-0070:9-10) It went on to cite the European Committee's reports which recommended "one hour daily outdoor exercise and/or time in the open air…." And the District Court noted that the European Committee recommended "at least one hour of exercise in the open air every day…The CPT wishes to emphasize that all prisoners without exception…should be offered…outdoor exercise daily" was recommended "as far back as 1992." (1-ER-0070:21-24)

## B.    BUILDING CODE TITLE 24

Section 1231.2.10 of Title 24 of the BSCC's Minimum Standards for Local Detention Facilities states that Type II and Type III correctional facilities must

have at least "[a]n outdoor exercise area" for "one-hour exercise periods per day."

The BSCC's authority under Cal. Penal Code §4015 has been established for

decades. And Title 24 is part of the State Building Code which is premised on

health and safety.[7] CJ3, as Type II facility has been required to comply with

Section 1231.2.10 of Title 24, which specifies not only that an outdoor exercise

space is required, but provides minimum dimensions and standards.[8] Section

1231.2.10 provides for no exceptions to its requirements.

### C. COMPARISON TO OTHER REGIONAL DETENTION FACILITIES/REGIONAL STANDARDS

Other Bay Area penal institutions provide inmates with access to natural

sunlight and outdoor recreation. For example, Sheriff Miyamoto testified regarding

the San Quentin State Prison ("San Quentin"), located at the north end of San

---

[7] Title 24 In 1978, California mandated that building standards be unified in a single code designated as Title 24, the California Building Standards Code. (SB 331, Robbins - https://www.dgs.ca.gov/BSC) *see* California's Health and Safety Code §18938(b) (Uniform Building Codes "shall" apply to all occupancies throughout the state), §18941.5 (localities may adopt more restrictive building standards).

[8] An outdoor exercise area or areas must be provided in every Type II and Type III facility. The minimum clear height must be 15 feet (4572 mm) and the minimum number of square feet of surface area will be computed by multiplying 80 percent of maximum rated population by 50 square feet (4.7 m2) and dividing the result by the number of one-hour exercise periods per day. The exercise area must contain or provide free access to a toilet, wash basin, and drinking fountain as provided in Section 1231.3. There must be at least one exercise area of not less than 600 square feet (55.7 m2). 24 Cal. Code Regs. §1231.2.10 (3-ER-0388)

Francisco Bay in Marin County. (9-ER-1983:10-12) San Quentin is near Larkspur and other small towns in Marin County. (9-ER-1985:16-19) San Quentin has multiple outdoor exercise yards, and inmates at San Quentin use those exercise yards. (9-ER-1986:4-9; 9-ER-1989:2-5) Troy McAlister testified that he used the outside yards, every day, for eight or more hours a day, during his four years incarcerated at San Quentin. (8-ER-1725:14 to 8-ER-1726:23)

Unlike CJ3, San Quentin, as a State Prison does not house a pretrial detainee population, who are presumed innocent. Instead, San Quentin houses inmates who have been convicted of very serious crimes, including rape, murder and assault. San Quentin also houses rival gang members at the same time, and Death Row inmates. (9-ER-1984:4-22)

Sheriff Miyamoto is also familiar with the Santa Rita Jail across the Bay in Alameda County. (9-ER-1989:15 to 9-ER-1990:4) The Santa Rita Jail houses individuals who have been charged with very serious or violent crimes. The Santa Rita Jail is within a mile of residential neighborhoods, schools, and parks. The Santa Rita Jail has several outdoor exercise yards that its inmates use. Each of the separate buildings that house inmates at the Santa Rita Jail has an outdoor exercise yard that is available to its inmates. (9-ER-1991:4-24; 9-ER-1992:3-6)

The West County Detention Facility in Contra Costa County also houses pretrial detainees. Similar to CJ3, a majority of the inmates at the West County

27

Detention Facility are pretrial detainees. The West County Detention Facility is also built near to residential neighborhoods. (9-ER-1992:7-10; 9-ER-1993:11-17, 21-24)

The District Court cited the community standards in its Findings of Facts, to support her Finding of Law "standards in the community show that Defendant's actions are not rational and not reasonably related to a valid penological purposes." (ECF 478 p. 59)

## SUMMARY OF ARGUMENT

Plaintiffs' uncontradicted evidence at trial showed that human beings require daily exposure to sunlight, for one hour a day, and that they should not be deprived for more than three days of that opportunity and surely not for a whole year. Despite the fact that the District Court found Plaintiffs' expert's testimony and community standards credible on this issue and concluded "that the lack of direct sunlight was a causal factor in high blood pressure, diabetes, myopia, and weight gain in Plaintiffs" (1-ER-0051:26 to 1-ER-0054:1, 1-ER-0065:7 to 1-ER-0066:3); and despite the fact that the District Court then found that the Defendant's denial of daily exposure to direct sunlight amounted to reckless indifference to Plaintiffs needs and was without rational basis (1-ER-0067 to 1-ER-0071); the District Court ignores this uncontradicted evidence in crafting its remedy. As a result, the remedy fails to address the actual unconstitutional condition of confinement—the total

28

denial of sunlight. The District Court's remedy does nothing at all for the 57.5 percent of class members incarcerated for less than a year—they may continue to be deprived of all sunlight. It provides so little relief for the remaining class members--just 15 minutes a day after a year of total deprivation, that there is no evidence in the record suggesting this will reduce any class member's increased all-cause mortality risk.

The evidence in the case showed that recommendations across the board are all for one hour per day, minimum. The District Court's remedy, of a paltry 15 minutes per day of sunlight, rather than correcting the constitutional violations, disregards the evidence in the case, and ratifies defendants' wrongful conduct by permitting the ongoing harms to continue.

The District Court's remedy is an abuse of discretion and should be remanded for a remedy that provides all class members a minimum of one hour of sunlight per day with no prior denial period. Or, in the alternative, this case should be remanded to the District Court for further consideration including additional testimony and evidence, if warranted.

## STANDARD OF REVIEW

The scope of a permanent injunction is reviewed for abuse of discretion. *United States v. Washington*, 853 F.3d 946, 962 (9th Cir. 2017). "A District Court abuses its discretion when it makes an error of law." *Native Ecosystems Council v.*

*Marten*, 883 F.3d 783, 789 (9th Cir. 2018). Similarly, when the record contains no evidence to support the district court's decision, the district court has abused its discretion. *Oregon Natural Res. Council v. Marsh*, 52 F.3d 1485, 1492 (9th Cir. 1995). "An abuse of discretion is a plain error, discretion exercised to an end not justified by the evidence, a judgment that is clearly against the logic and effect of the facts as are found." *Rabkin v. Oregon Health Sciences Univ*., 350 F.3d 967, 977 (9th Cir. 2003) (citation and internal quotation marks omitted); *see also In re Korean Air Lines Co., Ltd*., 642 F.3d 685, 698 n.11 (9th Cir. 2011)(" A review for abuse of discretion requires looking at both whether the trial court applied the correct legal rule, and, if so, whether application of the rule was illogical, implausible, or without support in the record").

Legal questions are reviewed *de novo*. *Romero v. Garland*, 7 F.4th 838, 840 (9th Cir. 2021). A District Court's factual findings are reviewed for clear error. *Fed. Trade Comm'n v. Garvey*, 383 F.3d 891, 900 (9th Cir. 2004). Errors in determining the scope of remedy in a case constrained by the Prison Litigation Reform Act ("PLRA"), 18 U.S.C. §3626, are also reviewed for clear error. *Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1070 (9th Cir. 2010); *Brown v. Plata*, 563 U.S. 493, 541 (2011).

# ARGUMENT

The District Court, after identifying violations of Plaintiffs' rights, in error crafted a remedy that fails to offer any meaningful relief to Plaintiffs, allowing and in effect endorsing, a continued violation of pre-trial detainees' right to be free of punishment. The Prison Litigation Reform Act ("PLRA") "sets the standards for when a court may grant prospective relief concerning prison conditions." *Armstrong v. Newsom*, 58 F.4th 1283, 1293 (9th Cir. 2023). The PLRA cannot be used to shield Defendants from their Constitutional obligations to Plaintiffs. "[T]he Act neither alters the scope of substantive rights nor limits the type of relief that may be ordered if that relief is necessary to redress violations of those rights." *Benjamin v. Jacobson*, 172 F.3d 144, 163 (2d Cir. 1999). The PLRA provides, in relevant part that:

> [p]rospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right.

18 U.S.C. § 3626(a)(1). The PLRA "mean[s] just what it says—before granting prospective injunctive relief, the trial court must make the findings" the PLRA mandates. *Oluwa v. Gomez*, 133 F.3d 1237, 1239 (9th Cir. 1998). The Ninth Circuit has described them as "need-narrowness-intrusiveness" findings and

31

reviews them for clear error. *Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1070 (9th Cir. 2010); *Brown v. Plata*, 563 U.S. 493, 541 (2011). Here the District Court properly made the "needs" finding, but made a reversible error in crafting a remedy—a scant fifteen minutes of sun exposure after a full year of total deprivation—that offers no meaningful relief for class members.

## I.    THE "NEED" ELEMENT OF THE NEED-NARROWNESS-INTRUSIVENESS TEST HAS BEEN ESTABLISHED

The District Court properly found that the "need" finding of the need-narrowness-intrusiveness test was satisfied upon finding (1) an ongoing violation of a plaintiff's rights at the prison and (2) a common source of those violations, *See, e.g., Armstrong v. Newsom*, 58 F.4th 1283, 1293-94 (9th Cir. 2023). That "the lack of direct sunlight was a causal factor" of certain serious morbidities suffered by class representatives, including "high blood pressure, diabetes, myopia, and weight gain," including an increased risk in all-cause mortality of the Plaintiffs was determined by the District Court to constitute ongoing violation of Plaintiffs' rights. (1-ER-0065:7 to 1-ER-0066:3) Next, the District Court found finding no legitimate reason that Defendants could not comply with community standards and its own Building Code, and correctly concluded that Defendants "acted intentionally or [were] recklessly indifferent to Plaintiffs' needs" and Plaintiffs' suffering in violation of the Fourteenth Amendment and Article I, Section 7 of the California Constitution. (1-ER-0067:28 to 1-ER-0071:15)

32

The District Court's finding on the need element of the need-narrowness-intrusiveness test was amply supported. Plaintiffs are seeking remand, not on the needs finding, but on the District Court's wholly inadequate remedy.

## II. THE NARROWNESS-INTRUSIVENESS ELEMENTS MUST NOT BE SO PARSIMONIOUSLY DRAWN AS TO ALLOW CONTINUATION OF THE ONGOING CONSITITIONAL VIOLATION

The District Court made reversible error when it fashioned a remedy that failed to correct the underlying constitutional violation, and when it misinterpreted the legal standard for injunctive relief under the PLRA. 18 U.S.C. §3626(a)(1)(A). Under the PLRA, "[a] determination of whether the relief goes 'no further than necessary to correct the violation' and is 'narrowly drawn and the least intrusive means to correct the violation' will obviously rest upon case-specific factors-- namely, the extent of the current and ongoing constitutional violations." *Pierce v. Cty. of Orange*, 526 F.3d 1190, 1206 (9th Cir. 2008). Here, the District Court erred in prescribing a remedy so narrowly drawn that it failed to correct the current and ongoing constitutional violations.

When fashioning an equitable remedy, it is "well-settled" that "the nature and scope of the remedy are to be determined by the violation." *See Milliken v. Bradley*, 433 U.S. 267, 281-82 (1977). "Under the PLRA, plaintiffs are not entitled to the most effective available remedy; they are entitled to a remedy that eliminates the constitutional injury." *Ball v. LeBlanc*, 792 F.3d 584, 599 (5th Cir. 2015). "The

33

function of a court is limited to determining whether a constitutional violation has occurred, and to fashioning a remedy that does no more and no less than correct that particular violation." *Hoptowit v. Ray*, 682 F.2d 1237, 1246 (9th Cir. 1982). An injunction "must be tailored to correct the specific violation and no more obtrusive than to satisfy the constitutional minima." *Id.* at 1258.

In the context of prison litigation, the PLRA's need-narrowness-intrusiveness standard is in principle not much different from pre-PLRA law governing federal court civil rights injunctions, which require courts to do "no more than necessary to correct the underlying constitutional violation." *Gilmore v. People of the State of California,* 220 F.3d 987, 1006 (9th Cir. 2000) (footnote omitted); *accord*, *Georgia Advocacy Office. v. Jackson*, 33 F.4th 1325 (11th Cir. 2022), ("The fundamental principle of equity guiding the court at this stage is that injunctive relief should be limited in scope to the extent necessary to protect the interests of the parties." (citations and internal quotation marks omitted)). The Supreme Court has implied the same proposition when it equated its prior holdings limiting injunctive remedies to the PLRA's requirements. *Brown v. Plata*, 563 U.S. 493, 531 (2011) (citing a non-prison case and *Lewis v. Casey*, 518 U.S. 343, 357 (1996) in discussing the PLRA narrow tailoring requirement).

While courts must take the State's legitimate interests into account, "Courts may not allow constitutional violations to continue simply because a remedy would

involve intrusion into the realm of prison administration." *Brown v. Plata*, 563

U.S. 493, 511 (2011). While courts have discretion to fashion the injunctive relief,

the obligation is correct the constitutional violation, and the District Court's failure

to do so requires remand for further consideration. *Melendres v. Maricopa County*,

897 F.3d 1217, 1221 (9th Cir. 2018).

### A. THE DISTRICT COURT ERRED BY IGNORING THE UNCONTRADICTED EVIDENCE THAT INMATES NEED DAILY ACCESS TO DIRECT SUNLIGHT

The District Court committed reversible error when, despite acknowledging

that human beings require *daily* access to sunlight (1-ER-0072:10), and that the

denial of sunlight is a causal factor in Plaintiffs' serious medical problems (1-ER-

0066:2-3), it imposed an arbitrary full year waiting period before the majority of

Plaintiffs received any relief. The District Court improperly justified its remedy,

that provides no relief, on its own conclusion, unsupported by the record, of the

alleged "fact that Plaintiffs began suffering from medical problems approximately

a year after they were incarcerated." (1-ER-0072:10-11)

### 1) COMMUNITY STANDARDS DO NOT ALLOW FOR A YEAR OF DEPRIVATION OF DIRECT SUNLIGHT

The CPT's 2020 30th General Report's section on: *A decency threshold for*

*prisons—criteria for assessing conditions of detention*: lists as a criteria that "all

prisoners must benefit from a minimum access to one hour's daily outdoor exercise

and/or time in the open air, and two hours in the case of juvenile inmates." (2-ER-0279) No exception is made for those incarcerated for a year or less. It noted that "The failure to reach a minimum decency threshold can lead to situations in which prisoners are exposed to inhuman and degrading treatment." (2-ER-0273)

In reviewing conditions at a Turkish prison, the CPT noted that more than a *few days* without access to "open air" and "natural light" was inconsistent with humane conditions of detention:

> in all the law enforcement establishments visited, detention facilities were in a good state of repair and generally clean. That said, due to major structural deficiencies, they were unsuitable for detention lasting more than a few days. In particular, many police custody cells did not have access to natural light, and in none of the establishments visited had arrangements been made to enable detained persons to have access to the open air.

(2-ER-0269)

As early as 1992, the CPT noted no period of delay for its directive that "[t]he requirement that prisoners be allowed at least one hour of exercise in the open air **every day** is widely accepted as a basic safeguard (preferably it should form part of a broader programme of activities)." (2-ER-0306 to 2-ER-0307, ¶48, emphasis added).

At the national level, the ACA and the U.S. Marshall provide for no waiting periods before inmates are to have daily outdoor access. (2-ER-0332, §2E; 2-ER-0234, §G.6.1)

36

And at the state level, California's Building Code requires all facilities holding inmates longer than 96 hours must have outdoor space. Section 1231.2.10 of Title 24 of the BSCC's Minimum Standards for Local Detention Facilities states that Type II and Type III correctional facilities must have "[a]n outdoor exercise area." Type I facilities—local detention facilities "used for the detention of persons for not more than 96 hours excluding holidays after booking" and Type IV Facilities which house people who are part of work/education furlough or other programs involving access into the community—and the ability therefor to go outside, are exempted from the requirement to have an outdoor exercise area. 15 Cal. Code Regs. §1006.

The BSCC's authority to regulate minimum standards for jails under Cal. Penal Code §4015 has been established for decades. Title 24 is part of the State Building Code which is premised on health and safety.[9] CJ3, as Type II facility must comply with Section 1231.2.10 of Title 24, which specifies not only that an outdoor exercise space is required, but provides minimum dimensions and

---

[9] Title 24 In 1978, California mandated that building standards be unified in a single code designated as Title 24, the California Building Standards Code. (SB 331, Robbins - https://www.dgs.ca.gov/BSC) *see* California's Health and Safety Code §18938(b) (Uniform Building Codes "shall" apply to all occupancies throughout the state), §18941.5 (localities may adopt more restrictive building standards).

standards.[10] Section 1231.2.10 provides for no exceptions to its requirements for

any but Type I Facilities—those that hold inmates for less than 96 hours, and Type

IV Facilities—those in which inmates who come and go from the facility.

Courts in the Ninth Circuit routinely utilize the standards established by the

BSCC for the Legislature's intentions on the "minimum standards" in addition to

"objective indicia" in assessing the constitutionality of jail conditions. *See Castro*

*v. City of Los Angeles,* F.3d 1060, 1076-1077 (9th Cir. 2016). The District Court in

*Grizzle v. Cty. of San Diego,* Case No.: 3:17-cv-00813-JLS-RBM (S.D. Cal. Jul.

10, 2020) relied on *Castro* in ruling in favor of the detainee-plaintiff, holding:

> Taking Plaintiff's allegations as true, Sheriff Gore, as the
> relevant policymaker, had actual and constructive notice that
> the implemented schedule violated Plaintiff's right to outdoor
> yard time. See CAL. CODE REGS., tit. 24 § 1231.2.10 (2018)
> ("An outdoor exercise area or areas must be provided in every
> Type II and Type III facility."). Like in *Castro*, where the
> county's failure to conform to approved ordinances constituted
> as deliberate indifference, Plaintiff's allegations that Sheriff
> Gore's failed to conform to the approved requirements suggests
> the County was deliberately indifferent. Similarly, Plaintiff has
> sufficiently alleged that Sheriff Gore knew from Plaintiff's

---

[10] An outdoor exercise area or areas must be provided in every Type II and Type
III facility. The minimum clear height must be 15 feet (4572 mm) and the
minimum number of square feet of surface area will be computed by multiplying
80 percent of maximum rated population by 50 square feet (4.7 m2) and dividing
the result by the number of one-hour exercise periods per day. The exercise area
must contain or provide free access to a toilet, wash basin, and drinking fountain
as provided in Section 1231.3. There must be at least one exercise area of not less
than 600 square feet (55.7 m2). The design shall facilitate security and
supervision appropriate to the level of custody.

> notice, and should have known, that the implemented schedule's consequence of forcing detainees to choose between constitutionally protected sleep and exercise violated their rights. Plaintiff alleges sufficient facts that the County, through its schedule and customs derived from it, was deliberately indifferent to his constitutional rights. Plaintiff adequately alleges the County is liable for these claims.

*Grizzle*, supra. Case No. 17-CV-813-JLS, 2018 U.S. Dist. LEXIS 131014, at *24-25 (S.D. Cal. Aug. 3, 2018).[11]

Additionally, the California Attorney General issued an opinion that the BSCC's standards do not impose an unfunded mandate or a "new program" on localities but simply establish what is objectively "suitable" for conditions of confinement in California[12]. California Attorney General's Opinion 99-1214 (May 2, 2000). Put another way, the BSCC's standards simply memorialize current community standards of decency. The Attorney General's opinion adopted the principle that "minimum standards set by Board for local detention facilities reflect constitutional requirements." *Inmates of Riverside County Jail v. Clark,* 144

---

[11] Notably, the Court also held that the *Grizzle* "Plaintiff has alleged a constitutional violation in being denied outdoor exercise for eight months." 2018 U.S. Dist. LEXIS 131014 at 13. Eight months is far less time than what has been served by many of the class members in this case.

[12] Opinions of the Attorney General, while not necessarily controlling, should be accorded "great weight" as to the meaning of a constitutional provision or statute. *City of San Diego v. Shapiro*, 228 Cal. App. 4th 756, 773 (2014); *City of Fresno v. Clovis Unified Sch. Dist*., 204 Cal. App. 3d 417 (1988); *Cent. Delta Water Agency*, 653 F. Supp. 2d, 1066, 1079 (2009) (such opinions are "judicially noticeable persuasive, but non-binding authority").

Cal.App.3d 850 (4th DCA, 1983)[13]. That 2000 Attorney General opinion, which dealt with juvenile facilities, noted that the BSCC's "minimum standards" "constitute objective criteria which are needed to ensure that facilities remain suitable places for the confinement of minors." *Id.*

The District Court took judicial notice of the standards in Title 24 and the California Building Code in both its Order on Summary Judgment (5-ER-0988), and in its Findings of Fact and Law (1-ER-0069); stating "standards in the community show that Defendant's actions are not rational and not reasonably related to a valid penological purposes." (1-ER-0069:14-16)

Title 24 does not have a delayed implementation for the requirement of a physical outdoor yard for Type II or III Facilities (those "used for the detention of persons pending arraignment, during trial, and upon a sentence of commitment"). Only Type I Facilities—those in which inmates are head for 96 hours or less, and Type IV Facilities—those in which inmates may leave the facility, are exempted. 15 Cal. Code Regs. §1006 (definitions) (3-ER-0393)

In short, there is no evidence in the record offering any delay time in outdoor yard access for prisoners beyond the 96 hours in Title 24 for Type I Facilities, and certainly nothing supporting a year of deprivation.

---

[13] It appears that the court in *Inmates of the Riverside County Jail* was referring to the California Constitution.

### 2) A ONE-YEAR DELAY IN REMEDY IS INCONSISTENT CONFLICTS WITH THE ACCEPTED AND UNCONTRADICTED TESTIMONY OF DR. CZEISLER

Dr. Czeisler "opined that people need to get direct sunlight every day." (1-ER-0053:24) Denial of sunlight creates a similar level of health hazard as smoking. (8-ER-1812:1-5). The District Court accepted this opinion. (1-ER-0072:10) Without this daily exposure, Dr. Czeisler opined that a myriad of health issues can arise, including an increased risk for colorectal cancer, breast cancer, diabetes, myopia, and high blood pressure. (1-ER-0051 to 1-ER-0054; 8-ER-1810 to 8-ER-1830) The District Court found Dr. Czeiler's testimony credible on this issue and concluded "that the lack of direct sunlight was a causal factor in high blood pressure, diabetes, myopia, and weight gain in Plaintiffs." (1-ER-0066:1-3)

The circumstances leading to Dr. Czeisler's preparation and filing of his Supplemental Report are telling. When Dr. Czeisler was first informed that the inmates were *never* provided access to sunlight, he had difficulty accepting or comprehending such circumstance because he found it "inconceivable … that people would be held for years in the United States without the ability to be exposed to outdoor light." (8-ER-1807:14-23) Dr. Czeisler testified that it would be reasonable to deny human beings sunlight for up to three days, although has never designed a study in which he would "purposefully deprive people of access to sun's rays on their skin." (8-ER-8-1820:7-9; 8-ER-1814: 5-7) It would not be

41

ethical to do so for similar ethical concerns make it impossible to conduct double-blind tests to establish the harms of smoking. (8-ER-1810) Dr. Czeisler's testimony that three days denial of sunlight is reasonable closely parallels the qualifier in Title 24 that facilities who incarcerate people for more than 96 hours do not have to provide outdoor access.

Dr. Czeisler never stated or implied that any delay in relief would be appropriate, and certainly he never suggested it would be wise or ethical to deprive humans of sunlight on skin for a full year. Notably, Dr. Czeisler's three days cap on the ethical limits to the voluntary deprivation of sunlight in an experiment is roughly equivalent to Title 24's exception to the outdoor yard requirement for detention facilities applying to Type I facilities which hold detainees for 96 hours or less.

Defendants submitted no evidence to rebut or contradict Dr. Czeisler's opinion that and that human beings need daily exposure to sunlight.

### 3) THE ONE-YEAR OF SUNLIGHT DEPRIVATION IS CONSTITUTIONALLY IMPERMISSIBLE BECAUSE IT SUBJECTS PLAINTIFFS TO LIKELY ILLNESS

The District Court accepted Dr. Czeisler's opinion in this case that " the lack of direct sunlight was a causal factor in high blood pressure, diabetes, myopia, and weight gain in Plaintiffs." (1-ER-0066) Nevertheless, the Court did not offer any relief until such time as it found that serious and sometimes irreversible health

42

impacts had already manifested as morbidities in their health records. (1-ER-0072:7-9) In other words, relief is not offered until after the harm was realized.

Dr. Czeisler compared the effect of the deprivation of sunlight to smoking. (8-ER-1812:1-5) This conclusion was drawn in part from studies comparing people living nearer or farther from the equator. The farther a population is from the equator, where sunlight exposure is the greatest, the higher the blood pressure. (8-ER-1809) And, from studies looking at the effects of avoiding tanning or wearing sunscreen, which again were found to increases all-cause mortality (even taking into account skin cancer risks). (8-ER-1804-1805) While these studies showed risks on par with smoking, none examined anything as dramatic as total deprivation of sunlight exposure for a year.

While there is no caselaw authority addressing the lack of access to direct sunlight as a condition of confinement, there is extensive case law addressing conditions of confinement that are "sure or very likely to cause serious illness and needless suffering" in the future. *Helling v. McKinney,* 509 U.S. 25, 33 (1993). This caselaw does not support cruelly delaying relief until negative health impacts, some irreversible, manifest. The Supreme Court addressed similar risks in *Helling*. There, the inmate-plaintiff alleged that the defendants assigned him to a cell with another inmate who smoked five packs of cigarettes a day. *Id.* at 28. At issue was whether this exposure to environmental tobacco smoke ("ETS") violated the

43

plaintiff's Eighth Amendment rights even though Plaintiff had alleged only future

harm. The Court found that the exposure could violate Plaintiff's rights despite the

absence of an existing injury:

> We have great difficulty agreeing that prison authorities may
> not be deliberately indifferent to an inmate's current health
> problems but may ignore a condition of confinement that is sure
> or very likely to cause serious illness and needless suffering the
> next week or month or year. In *Hutto v. Finney*, 437 U.S. 678,
> 682 (1978), we noted that inmates in punitive isolation were
> crowded into cells and that some of them had infectious
> maladies such as hepatitis and venereal disease. This was one of
> the prison conditions for which the Eighth Amendment required
> a remedy, even though it was not alleged that the likely harm
> would occur immediately and even though the possible
> infection might not affect all of those exposed. We would think
> that a prison inmate also could successfully complain about
> demonstrably unsafe drinking water without waiting for an
> attack of dysentery. Nor can we hold that prison officials may
> be deliberately indifferent to the exposure of inmates to a
> serious, communicable disease on the ground that the
> complaining inmate shows no serious current symptoms.

*Id*. at 33 (emphasis added). Noting with approval the Government's argument as

*amicus curiae* "that there may be situations in which exposure to toxic or other

substances would 'present a risk of sufficient likelihood or magnitude-and in which

there is a sufficiently broad consensus that exposure of anyone to the substance

should therefore be prevented,'" *Id*. at 35 (emphasis in original), the Court

ultimately held that an inmate "states a cause of action under the Eighth

Amendment by alleging that [prison officials] have, with deliberate indifference,

exposed him to levels of ETS that pose an unreasonable risk of serious damage to

44

his future health." *Id.* Relief was not delayed until such time as cancer or even bronchitis manifest in plaintiff's body or health records.

Courts have relied on *Helling* to hold that an inmate has the right to be free from exposure to another environmental toxin, asbestos. In *Wallis v. Baldwin*, 70 F.3d 1074, 1077 (9th Cir. 1995), this Court was asked to consider whether the District Court improperly entered summary judgment for the defendants on plaintiff's Eighth Amendment conditions of confinement claim: "[T]he critical question before the District Court was whether the defendants acted with 'deliberate indifference' in exposing Wallis to the asbestos in the [prison's] attics." *Id.* at 1076 (citing *Helling*). Noting that "[i]t is uncontroverted that asbestos poses a serious risk to human health," the Court reversed the grant of summary judgment after concluding that the evidence established that the defendants knew of the existence of the asbestos in the attic and the threat to the inmates' health from exposure to it but nonetheless forced plaintiff to clean the attic without protection. *Id.*; *See also Doyle v. Coombe,* 976 F. Supp. 183, 188 (W.D.N.Y. 1997) (acknowledging that "an Eighth Amendment claim may be established from exposure to substances which might cause a delayed injury."); *Gonyer v. McDonald*, 874 F. Supp. 464, 466 (D. Mass. Feb. 1, 1995) (citing *Helling* in finding a cognizable Eighth Amendment claim for exposure to asbestos); *Carter v. Smith*, 2015 WL 4322317, at *7 (N.D. Cal. July 15, 2015) (citing *Helling* in

acknowledging "[e]xposure to toxic substances may be a sufficiently serious condition to establish the first prong of an Eighth Amendment claim"). In none of these asbestos cases was the plaintiff required to first demonstrate a case of mesothelioma.

*Helling* has also been cited in cases involving exposure to other conditions of confinement that pose an unreasonable risk of harm to health, including contagious diseases caused by overcrowding conditions. *Brown v. Mitchell,* 327 F. Supp. 2d 615, 650 (E.D. Va. July 28, 2004) (contaminated water); *Carroll v. DeTella,* 255 F.3d 470, 472 (7th Cir. 2001)(compelled use of chemical toilets); *Masonoff v. DuBois*, 899 F. Supp. 782, 797 (D. Mass. Sep. 11, 1995) ("daily contact with a hazardous substance which causes rashes, burning, tearing eyes and headaches"); *Crawford v. Coughlin,* 43 F. Supp. 2d 319, 325 (W.D.N.Y. 1999)(paint toxins); *Randles v. Singletary*, 2001 WL 1736881, at *2 (M.D. Fla. Aug. 10, 2001)(other inmates' blood).

*Helling* thus stands for the proposition that a correctional institution may not continue to expose individuals to "a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month *or year*." *Helling*, 509 U.S. at 30 (emphasis added). It is difficult to imagine a scenario in which a jail would be permitted to continue to house a non-smoking inmate with a cellmate who smokes five packs a day until a diagnosis of cancer or

even chronic bronchitis appears in the medical records. But that is precisely what the District Court's remedy does here: continue to expose Plaintiffs to a condition of confinement--the deprivation of direct sunlight--for one year even though it "is sure or very likely" to harm Plaintiffs. This is unconstitutional.

It is also difficult to reconcile the District Court's delayed remedy with its finding that "the evidence from Czeisler was that each person must have access to direct sunlight every day" (1-ER-0071:27-28), and its reliance upon community standards that offer no delayed access to daily sunlight beyond 96 hours (1-ER-0070). Indeed, it is nonsensical and cruel to cause Plaintiffs to develop preventable, but sometimes irreversible, ailments before providing them with a remedy. That remedy is too late.[14] As Dr. Czeisler pointed out, Vitamin D deficiency is a signal of sunlight deprivation, but Vitamin D tablets are not a cure and do not reverse the injury already incurred.

---

[14] This calls into question the Court's denial of Plaintiffs' requested relief to monitor and provide Vitamin D supplements as well. The Court ignoring its own imposed year's deprivation period held "given the Court orders that each inmate have direct access to sunlight every day, monitoring and treatment are no longer necessary." (1-ER-0072:21-22) But the Court in fact does not order daily access to sunlight, in fact it legitimates the practice of totally depriving prisoners of such access for a full year.

47

### 4) THE EVIDENCE DOES NOT SUPPORT THE DISTRICT COURT'S CONCLUSION THAT HARMS BEGAN AT ONE YEAR

The Court, in permitting a full year of total sunlight deprivation, stated that "Plaintiffs began suffering from medical problems approximately a year after they were incarcerated." (1-ER-0072:10-11) But the District Court did not cite to *any* specific evidence in the record to support its conclusion because there is none. The Court itself made *contrary* findings of fact; for instance, the District Court noted Plaintiff McAlister developed hypertension within six months of his incarceration. (1-ER-0043:16-17)

The conclusion stated by the District Court that a one year deprivation of sunlight is permissible because maladies manifest at the one year mark is unsupported by the record, and therefore an improper basis upon which to deny pre-trial detainees sunlight for a full year, subject to remand.

### B. THE DISTRICT COURT ERRED IN IGNORING THE EVIDENCE THAT PLAINTIFFS NEED ONE HOUR OF SUNLIGHT, DAILY.

Plaintiffs requested a minimum of one hour outdoor sun exposure daily. (1-ER-0071:25-27). The District Court, in error and with no supporting evidence whatsoever, ordered only 15 minutes a day (after a year of total deprivation). In so ordering the District Court offered only the following: "[t]he amount of time—15 minutes—is more than *de minimis* but less intrusive on the Defendant." (1-ER-

0072:15-16). The Court cannot ignore evidence in the record supporting an hour of daily exposure to substitute a remedy affording just a quarter of that amount with no evidentiary underpinning. To the extent the District Court may have found the available evidence insufficient, it should have allowed for greater fact finding.

### 1)   COMMUNITY STANDARDS CITED BY THE DISTRICT COURT SUPPORT ONE HOUR OF SUNLIGHT EXPOSURE DAILY

As noted above, section IV, the District Court took judicial notice of the U.S. Marshalls Service's Federal Performance-Based Detention Standards Handbook, the 2021 Fifth Edition of Performance-Based Standards and Expected Practices for Correctional Institutions by the ACA, and the Thirtieth Annual Report of the European Committee for the Prevention of Torture and Inhumane or Degrading Treatment or Punishment ("CPT"). These documents evidence the state, national, and international standards relating to inmates' access to the outdoors. In each document, it is recommended that inmates receive at least one hour of outdoor access daily:

1.   The 1992 Second General Report of the CPT states, "The requirement that prisoners be allowed at least **one hour** of exercise in the open air every day is widely accepted as a basic safeguard (preferably it should form part of a broader programme of activities)." (2-ER-0307-0308, ¶48, emphasis added)

49

2. The 2020 Thirtieth General Report of the CPT recommends "minimum of access to **one hour's daily outdoor exercise and/or time in the open air**, and two hours in the case of juvenile inmates. This remains a fundamental right for all prisoners, including during the COVID-19 pandemic." (2-ER-0279, ¶ 80, emphasis added.)

3. The 2021 Fifth Edition Performance-Based Standards and Expected Practices for Adult Correctional Institutions by the ACA states, "Both outdoor and covered/enclosed exercise areas for general population inmates are provided in sufficient number to ensure that each inmate is offered at **least one hour of access daily**. **Use of outdoor areas is preferred**, but covered/enclosed areas must be available for use in inclement weather." (2-ER-0332, §2E, emphasis added)

4. The 2022 Federal Performance Based Detention Standards Handbook states, "Prisoners have access to exercise opportunities and equipment, including at least **one-hour daily** of physical exercise outside the cell and **outdoors,** when weather permits. (Access to the housing unit's dayroom does not satisfy the standard's requirement.)" (2-ER-0234, §G.6.1, emphasis added.)

The District Court relied on these documents in finding that "standards in the community show that Defendant's actions are not rational and not reasonably

50

related to a valid penological purposes." (Dkt. No. 478 at 59.) Inexplicably, the District Court then ignored these same documents insofar as they evidence a need for one hour of time outdoors.

### 2) THE DISTRICT COURT DOES NOT EXPLAIN THE BASIS FOR ITS PALTRY 15 MINUTES PER DAY OF DIRECT SUNLIGHT

The District Court failure to offer any authority, evidence or explanation for the 15 minute quantity beyond a belief that it would be less intrusive to the Defendants. The Court made no finding as to whether it would actually remedy the harm to Plaintiffs. In a bench trial under Federal Rule of Civil Procedure 52, the court's findings of fact are presumed to be based on admissible evidence only. *Williams v. Illinois*, 567 U.S. 50, 69 (2012). The judge is not a witness in the case. Fed. R. Evid. 605 ("The presiding judge may not testify as a witness at the trial.") Therefore, a court may not base its determination on its own private knowledge or fabricate evidence, which is "untested by cross-examination or any of the rules of evidence." *Bonhiver v. Rotenberg Schwartzman*, 461 F.2d 925, 928-29 (7th Cir. 1972). To allow such a determination "constitutes a denial of due process of law." *Id.*

In ordering only 15 minutes of daily access to direct sunlight, and then only after one full year of total denial to sunlight, the District Court improperly acted as an expert witness by relying on its own unqualified and untested opinion

apparently based on nothing in the record. This, at the very least, warrants remand due to the District Court's denial of Plaintiffs' due process rights.

### C. AN ORDER OF ONE HOUR OF SUNLIGHT DAILY, WITH NO MORE THAN A THREE-DAY DELAY IS CONSISTENT WITH THE NARROWNESS-INTRUSIVENESS ELEMENTS OF THE PLRA STANDARD AND IS WARRANTED BY THE TRIAL EVIDENCE

The Prison Tort Reform Act, 18 U.S.C. §3626(a), codifies the traditional norms regarding injunctive relief and the state regulation of prisons and mimics Rule 65 of the Federal Rules of Civil Procedure. *Morales Feliciano v. Calderon Serra*, 300 F.Supp.2d 321, 339-40 (D.P.R. 2004) "The [Prison Litigation Reform Act ("PLRA")] does not displace these equitable considerations in cases that fall within its ambit. *See Swain v. Junior*, 961 F.3d 1276 (11th Cir. 2020) (applying the traditional equitable considerations on review of a preliminary injunction subject to the PLRA)." *Ga. Advocacy Office v. Jackson, 4 F.4th 1200, 1208,* (11th Cir., 2021). Therefore, it is incumbent on the District Court to craft a remedy that eliminates the constitutional violations.

The Ninth Circuit has cogently identified "the core concern of the intrusiveness inquiry which is whether the District Court has 'enmeshed [itself] in the minutiae of prison operations,' beyond what is necessary to vindicate plaintiffs' federal rights. . ." The question is "whether the same vindication of federal rights could have been achieved with less involvement by the court in directing the

52

details of defendants' operations." *Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1071 (9th Cir. 2010) (citation omitted); *accord*, *Armstrong v. Brown*, 768 F.3d 975, 986 (9th Cir. 2014). In *Armstrong v. Schwarzenegger*, *supra*. this Court made the quoted remarks in the course of distinguishing intrusiveness from burden, a point discussed further below.

The prohibition is against micro-managing, not a bar against fashioning a genuine remedy that actually addresses the constitutional violation. *See Armstrong v. Brown*, 768 F.3d 975, 983 (9th Cir. 2014) (stating "[t]he court may provide guidance and set clear objectives, but it may not attempt to micro manage prison administration . . . or order relief that would require for its enforcement the continuous supervision by the federal court over the conduct of [state officers]") (citations and internal quotation marks omitted)). There is no case which holds that in order to satisfy the intrusiveness requirement of the PLRA, that the remedy for injunctive relief cannot correct the violation. Indeed, this Court has held that district court action which grants relief that corrects violations of inmates rights meets the "need-narrowness-intrusiveness requirement" of the PLRA even where defendants claim intrusiveness. *See, e.g., Edmo v. Corizon, Inc*., 935 F.3d 757, n.19 (9th Cir. 2019), *reh'g denied en banc* 949 F.3d 489 (9th Cir. 2020), cert. denied, 141 S. Ct. 610 (2020)("[W]hen the medical consensus is that a treatment is effective and medically necessary under the circumstances, prison officials render

unacceptable care by following the views of outliers without offering a credible medical basis for deviating from the accepted view.")

The Courts have held that remedies may require more than the bare minimum, and still be necessary and narrowly drawn. *Benjamin v. Fraser*, 343 F.3d 35, 54 (2d Cir. 2003); *accord*, *Handberry v. Thompson*, 446 F.3d 335, 347 (2d Cir. 2006) (stating that a remedy may be PLRA-compliant even if "over-inclusive"; noting generally that a remedy may require more than the bare minimum of federal law and may still be necessary and narrowly drawn, because the remedy provides a "practicable 'means of effectuate[on]'").

Courts have held that a rational approach, even if it addresses a broader situation than the specific problem, is not intrusive if rational and pragmatic concerns are applicable in assessing PLRA compliance with remedial provisions *Benjamin v. Fraser,* 156 F.Supp.2d 333, 350 (S.D.N.Y. 2001), *aff'd in relevant part*, 343 F.3d 35 (2d Cir. 2003). In *Benjamin*, the court ordered a comprehensive repair program for the jail's windows rather than a window-by-window replace/replace determination, because a comprehensive repair program was more pragmatic and rational and resulted in a less intrusive means of enforcement. On appeal, the court agreed emphatically. ("[I]t is ironic that the City . . . invokes the PLRA, which was intended in part to prevent judicial micro-management, in support of the proposition that the District Court was required to examine every

54

window. . . . Given the impracticability of the court examining each window, ordering comprehensive repairs was a necessary and narrowly drawn means of effectuating relief–even though the Constitution would certainly permit a broken window or two.").

The District Court in this case, in an effort to avoid intrusiveness, and to show deference to the Defendant, confused intrusiveness with the need to craft a remedy that actually corrects the constitutional violation. Systemic relief is permissible if supported by proof of a systemic violation. *Brown v. Plata*, 563 U.S. 493, 532 (2011). Clearly, Defendants engaged in systemic violation where they purposely constructed a jail in violation of the California building code; and this systemic violation requires systemic relief where the community standards, and state regulation provide that all inmates are entitled to outdoor access. Denial of sunlight for one year, and then only 15 minutes a day of access to sunlight, fails to apply the rule of reason and fails to actually cure the constitutional violation. There is no requirement that a plaintiff actually fall ill before injunctive relief is available. *Helling* held that the Eighth Amendment requires a remedy to address future harms, potential harms, likely harms and there is no need to plead that the harm would occur immediately. "We would think that a prison inmate also could successfully complain about demonstrably unsafe drinking water without waiting for an attack of dysentery. Nor can we hold that prison officials may be

deliberately indifferent to the exposure of inmates to a serious, communicable disease on the ground that the complaining inmate shows no serious current symptoms." *Helling v. McKinney*, supra. 509 U.S. at 33.

Intrusiveness in the present case would be if the District Court prescribed the specific schedule for daily exposure to sunlight, or specified staffing assignments or the manner in which inmates are to be transported to the outside.[15] These are the sort of minutiae which the PLRA prohibits. There are no cases which hold that requiring a general remedy to rectify a constitutional violation, such as requiring a

---

[15] The District Court comes much closer to this intrusiveness in evaluating the Defendants efforts to comply with its order, on Defendants' motion. (1-ER-0002 et seq.) The District Court attempt to parse which specific rooms in CJ3 may have some direct sunlight on some days of the year at some hours of the day, every changing. The District Court found that:

> The Court observed that the windows on the walls allowed sunlight to pass through without a barrier but that the placement of the windows and time of day affected whether any sunlight shone directly into the gym. And given the size of the windows (two windows each six feet by eight feet), the sunlight that did come through the windows only appeared in patches and did not cover the entire gym. In some gyms, there appeared to be no direct sunlight in the gym.

(1-ER-0006). In other words, the District Court was measuring shadows and taking into account "the rotation of the Earth, solar hour angles, solar altitude angles, and the direction of the Sun." (1-ER-0007) After a site inspection, the District Court concluded that "[a]lthough placing metal grates over a window allows direct sunlight to enter County Jail 3, the method that Defendant has chosen does not allow each inmate 15 minutes of access to direct sunlight each day" but made no order to Defendants. (1-ER-0009)

jail to provide outdoor access so that inmates can obtain direct sunlight, is overly intrusive or engaging in minutiae. It is clear error for the District Court to permit Defendants to deny inmates access to sunlight for such a long length of time, one year; a period sufficiently long that inmates actually fall ill; and then to only require Defendants provide a modicum of access to sunlight, which all evidence demonstrates is insufficient and does not meet community standards. Not only was there no evidence that 15 minutes per day was sufficient on a regular basis to maintain health, there was absolutely no evidence that 15 minutes per day, *after a solid year of denial of sunlight*, is sufficient for palliative treatment of the illnesses resulting from the one year deprivation of sunlight; much less curative. The District Court's order for the remedy, should be remanded to the District Court to provide the District Court with an opportunity to fashion a remedy that cures the constitutional violation based upon the evidence before it.

## CONCLUSION

"[T]he Fourteenth Amendment prohibits all punishment of pretrial detainees," citing *Demery v. Arpaio* 378 F.3d 1020, 1029 (9th Cir. 2004). For pretrial detainees, presumed innocent, the daily denial of sunlight that results in the steady, and inexorable progress to chronic and serious illness could be nothing other than unconstitutional punishment. The District Court agreed, finding the need for relief. The District Court then erred when it permitted complete deprivation of

sunlight on skin for a full year, and then an unjustified mere 15 minutes of daily sunlight thereafter.

There is no justification for the denial of all access to sunlight. The sole medical expert to offer credible testimony on the effects of sunlight on skin on human physiology was Plaintiffs' expert Dr. Czeisler. Dr. Czeisler the deprivation of sunlight at CJ3 is "inconceivable" in the United States. Conditions in a Turkish facility depriving prisoners more than a *few days* without access to "open air" and "natural light" was considered inconsistent with humane conditions of detention by the European Committee for the Prevention of Torture and Inhuman or Degrading Treatment or Punishment, Council of Europe. The Building Code requires facilities in which people must stay for longer than 96 hours to have outdoor recreation space.

Inasmuch as the District Court 's remedy is unsupported by any evidence in the record—and actually contradicted by it, Plaintiffs and class members respectfully request that this Court reverse the remedies portion of the District Court's Order and that this matter remanded to the District Court for an order that requires all pretrial inmates housed at CJ3 be immediately provided with one hour per day of access to sunlight or in the alternative, if needed, remanded to the District Court for additional evidence on the appropriate and necessary amount of sunlight class members should receive.

Dated: December 4, 2024      Respectfully Submitted,

Yolanda Huang (SBN 104543)
LAW OFFICE OF YOLANDA HUANG
P.O. Box 5475
Berkeley, CA 94705
(510) 329-2140
yhuang.law@gmail.com

Dated: December 4, 2024      /s/ Rachel S. Doughty

Rachel S. Doughty (SBN 255904)
GREENFIRE LAW, PC
2748 Adeline Street, Suite A
Berkeley, CA 94703
(510) 900-9502
rdoughty@greenfirelaw.com

## ADDENDUM

42 U.S. Code §1983 (Civil Action for Deprivation of Rights) states:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

The 14th Amendment to the United States Constitution states:

> All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

The 8th Amendment to the United States Constitution states: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."

Article 1, Section 7(a) of the California Constitution states:

> (a) A person may not be deprived of life, liberty, or property without due process of law or denied equal protection of the laws; provided, that nothing contained herein or elsewhere in

60

this Constitution imposes upon the State of California or any public entity, board, or official any obligations or responsibilities which exceed those imposed by the Equal Protection Clause of the 14th Amendment to the United States Constitution with respect to the use of pupil school assignment or pupil transportation. In enforcing this subdivision or any other provision of this Constitution, no court of this State may impose upon the State of California or any public entity, board, or official any obligation or responsibility with respect to the use of pupil school assignment or pupil transportation, (1) except to remedy a specific violation by such party that would also constitute a violation of the Equal Protection Clause of the 14th Amendment to the United States Constitution, and (2) unless a federal court would be permitted under federal decisional law to impose that obligation or responsibility upon such party to remedy the specific violation of the Equal Protection Clause of the 14th Amendment of the United States Constitution.

## CERTIFICATE OF SERVICE

I hereby certify that on December 4, 2024, I electronically filed the foregoing document APPELLANTS MONTRIAL BRACKENS, TROY MCALISTER and JOSE POOT'S OPENING BRIEF with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I hereby certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: December 4, 2024

By _____/S/ Rachel Doughty_____
Rachel Doughty
*Attorney for Appellants*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)**  24-4789

I am the attorney or self-represented party.

**This brief contains**  13,253  **words,** including  0  words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  ☐ it is a joint brief submitted by separately represented parties.
  ☐ a party or parties are filing a single brief in response to multiple briefs.
  ☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated _____.

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**  /s/Rachel Doughty  **Date**  December 4, 2024
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**                                                                    *Rev. 12/01/22*