# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## CASE NO. 24-4789

MONTRAIL **BRACKENS,** JOSE POOT, TROY MCALLISTER, et al.,
*Plaintiffs-Appellants,*

v.

**CITY AND COUNTY OF SAN FRANCISCO** and SHERIFF PAUL
MIYAMOTO, in his official capacity,
*Defendants-Appellees.*

On Appeal From the U. S. District Court for the Northern District of
California

No. 3:19-cv-02724-SK (The Honorable Sallie Kim)

---

*AMICI CURIAE* BRIEF OF LEGAL SERVICES FOR PRISONERS
WITH CHILDREN *ET. AL.* IN SUPPORT OF APPELLANTS

---

Eric C. Sapp (SBN 240372)
Kellie Walters (SBN 342755)
LEGAL SERVICES FOR PRISONERS WITH CHILDREN
4400 Market Street, Oakland, CA 94608 (415)-625-7046
erics@prisonerswithchildren.org, kellie@prisonerswithchildren.org

# TABLE OF CONTENTS

Statements of Interest………………………………………………2

Disclosures……………………………………………………5

Table of Authorities……………………………………………6

Introduction……………………………………………………9

Argument………………………………………………………9

    **I.  The Prison Litigation Reform Act Requires That The Proposed Remedy Address the Violation**

    A. Historical Background………………………………………9

    B. Need-Narrowness Test of the Prison Litigation Reform Act…12

    **II.  The District Court Abused Its Discretion Because Its Judgment is Illogical, Implausible, and Unsupported**

    A. *Hinkson*………………………………………………18

    B. *Doe v. Kelly* ……………………………………………23

Conclusion………………………………………………………25

STATEMENTS OF INTEREST

**Legal Services for Prisoners with Children** (LSPC) is a non-profit
organization, dedicated, for over 45 years, to protecting and advancing
the civil and human rights of persons affected by the carceral system.
LSPC provides legal training, legal technical assistance, and advocacy
support to legal services providers throughout the state on issues
affecting incarcerated persons, formerly incarcerated persons, and their
families.

**Community Legal Services in East Palo Alto** (CLSEPA) is a nonprofit
organization that offers legal services that improve the lives of low-
income families throughout the Bay Area region. CLSEPA is committed
to pursuing multiple, innovative strategies, including community
education, individual legal advice and representation, legal assistance
to community groups, policy advocacy, and impact litigation.

**Disability Rights Legal Center** (DRLC) is a non-profit legal organization
that was founded in 1975 to represent and serve people with

disabilities. Individuals with disabilities continue to struggle with ignorance, prejudice, insensitivity, and lack of legal protections in their endeavors to achieve fundamental dignity and respect. DRLC assists people with disabilities in obtaining the benefits, protections, and equal opportunities guaranteed to them under the Rehabilitation Act of 1973, the Americans with Disabilities Act, the Unruh Civil Rights Act, and other state and federal laws. DRLC's mission is to champion the rights of people with disabilities through education, advocacy and litigation. DRLC is generally acknowledged to be a leading disability public interest organization. DRLC also participates in various *amici curiae* efforts in a number of cases affecting the rights of people with disabilities.

**UnCommon Law** (UCL) is committed to transforming the narrative around incarceration, particularly for those convicted of violent crimes. For nearly two decades, UCL's team has fought to ensure that all people incarcerated for violent crime have access to healing, justice, and effective legal representation. Through a unique, trauma-informed model of advocacy, UCL provides the space currently missing in the

3

system for healing, accountability, and safe pathways home from prison. UCL participates in *amici curiae* efforts to influence broader systemic change in California's carceral system.

DISCLOSURES UNDER F.R.A.P. 29(a)(4)(E)

No party's counsel authored this brief in whole or in part.

No party's counsel contributed money intended to fund this brief.

No person, apart from the *amici* joined on this brief, or their counsel and members, contributed money intended to fund this brief.

TABLE OF AUTHORITIES

<u>Cases</u>

Anderson v. Bessemer City, 470 U.S. 564, 577 (1985)...............18

Armstrong v. Newsom, 58 F.4th 1283 (9th Cir. 2023).................11

Castillo v. Barr, 449 F. Supp. 3d 915 (C. D. Cal. 2020)..............11

Doe v. Kelly, 878 F.3d 710 (9th Cir. 2017) ...........................23-25

Gilmore v. People of the State of California, 220 F.3d 987 (9th Cir. 2000)

...............................................................................10

Hampton v. California, 83 F.4th 754 (9th Cir. 2023).................11

Madrid v. Gomez, 889 F. Supp. 1146 (N. D. Cal. 1995)..............11

Stroud v. Swope, 187 F.2d 850, 851–52 (9th Cir. 1951),

      cert. denied, 342 U.S. 829 (1951)..................................10

Toussaint v. McCarthy, 597 F. Supp. 1388, 1399 (N.D. Cal. 1984),

      aff'd in part and rev'd in part by Toussaint v. McCarthy, 801 F.2d

      1080 (9th Cir. 1986)................................................. 24

United States v Hinkson, 585 F.3d 1247 (9th Cir. 2009)...........18-19

Whitford v. Salmonsen, 2024 U.S. Dist. LEXIS 65765..............12

Statutes

18 U.S.C. § 3626 ...............................................................passim

Treatises, Articles, and Other Authorities

Alfredsson, L.; Armstrong, B.K.; Butterfield, D.A.; Chowdhury, R.;
 de Gruijl, F.R.; Feelisch, M.; Garland, C.F.; Hart, P.H.; Hoel, D.G.;
 Jacobsen, R.; et al. *Insufficient Sun Exposure Has Become a Real*
 *Public Health Problem. Int. J. Environ. Res. Public*
 *Health* 2020, *17*, 5014 ....................................................16

Bureau of Justice Statistics (DOJ), Disabilities Reported by Prisoners:
 Survey of Prison Inmates (2016)......................................15

Kent, S.T., McClure, L.A., Crosson, W.L. et al. Effect of Sunlight
 Exposure On Cognitive Function Among Depressed And Non-
 Depressed Participants: A REGARDS Cross-Sectional Study.
 Environ Health 8, 34 (2009)..............................................17

Kumar, V. et al., *Robins and Cotran Pathologic Basis of Disease*, 8th ed.,
 Philadelphia: Saunders Elsevier (2010)...........................22

Morris, N. *The Contemporary Prison: 1865–Present, in*
 The Oxford History of The Prison 245 (Norval Morris & David J.
 Rothman eds., 1995).......................................................11

Møller, L., Stöver, H., Jürgens, R., Gatherer, A., and Nikogosian, H.

    World Health Organization, Health in Prisons: A WHO Guide to

    The Essentials in Prison Health (2007)...........................13-14

National Institute for Health and Care Excellence, *Vitamin D:*

    *Supplement Use in Specific Population Groups* (2016)..........14-15

Prison Policy Initiative, Disability: Research on the Prevalence of,

    And Challenges Faced by, People With Disabilities in the

    Criminal Legal System (2025).......................................15

Sunlight Institute, *How Well Are You Thinking? Does Lack of Sunlight*

    *Lead To Intellectual Disabilities?* (2015)...........................17

United Nations Office on Drugs and Crime, *The United Nations*

    *Standard Minimum Rules for the Treatment of Prisoners* (2015)

    ....................................................................15

Wang J, Wei Z, Yao N, Li C, Sun L. Association Between Sunlight

    Exposure and Mental Health: Evidence from a Special Population

    Without Sunlight in Work. Risk Manag. Health Policy.

    2023;16:1049-1057...............................................17

INTRODUCTION

*Amici* support the Appellants' request for reversal of that portion of the district court's Order limiting injunctive relief to 15 minutes of direct sunlight per day after one year of detention. App. Opening Brief at 58 (ECF #8.1). They also support the request that this Court remand to the district court with instructions to order the jail authorities to provide at least one hour of direct sunlight per day immediately, without any year-long delay, or, in the alternative, remand to hear additional evidence as to the appropriate remedial measures.

The present brief focuses attention on two aspects in which, it is argued, the lower court erred. The aim is to clarify both (I.) the Prison Litigation Reform Act's remedial tailoring requirement and (II.) the applicability of this Circuit's standard of abuse of discretion to the instant case.

ARGUMENT

I. **The Prison Litigation Reform Act Requires That The Proposed Remedy Address the Violation**

A. Historical Background

In an earlier era, the courts took a "hands-off" approach to litigation involving the human rights of incarcerated individuals. This outdated doctrine espoused a line of thinking that the federal courts must not be concerned with the treatment of incarcerated individuals but only the legality of their lock up. "[I]t is well settled that it is not the function of the courts to superintend the treatment and discipline of prisoners in penitentiaries, but only to deliver from imprisonment those who are illegally confined." *Stroud v. Swope*, 187 F.2d 850, 851–52 (9th Cir. 1951), cert. denied, 342 U.S. 829, 72 S.Ct. 53, 96 L.Ed. 627 (1951); see *Gilmore v. People of the State of California*, 220 F.3d 987, 991 (9th Cir. 2000) (discussing the dissolution of the "hands-off" doctrine into a modern approach to addressing prison conditions)[1].

Since the 1960s, the courts have acknowledged that 42 USC §1983 is an appropriate vehicle for incarcerated individuals to challenge the conditions of their confinement, recognizing that the state, as custodian

---

[1] "[I]n landmark cases in the 1960's and 1970's the Supreme Court changed course, affirming the basic proposition that '[t]here is no iron curtain drawn between the Constitution and the prisons of this country,' […] and ratifying the availability of 42 U.S.C. § 1983 as a vehicle for vindicating prisoners' constitutional rights." *Gilmore*, 220 F.3d at 991 (internal citation omitted).

of the prisoners, has a duty to provide adult incarcerated individuals with safe and healthy conditions. See also *Hampton v. California*, 83 F.4th 754 (9th Cir. 2023); *Madrid v. Gomez*, 889 F. Supp. 1146 (N.D. Cal. 1995); *Castillo v. Barr*, 449 F. Supp. 3d 915 (C. D. Cal. 2020). This change "led the courts to the definition and enforcement of minimum standards of health care…and to the upholding of the Eighth Amendment guarantee against cruel and unusual punishments. Norval Morris, *The Contemporary Prison: 1865–Present, in* The Oxford History of The Prison 245 (Norval Morris & David J. Rothman eds., 1995).

Shortly after the overturning of the "hands-off" doctrine came the entrance of the Prison Litigation Reform Act. The Act sets stringent requirements for granting prospective relief in civil actions concerning prison conditions. *Armstrong v. Newsom*, 58 F.4th 1283 (9th Cir. 2023). Any prospective relief provided under the PLRA must be (1) narrowly drawn, (2) exist only to correct the violation of the Federal right, and (3) be the least intrusive means necessary to correct that violation. *Armstrong* at 1283.

However, these requirements do not invalidate the fact that the remedy must address the underlying injury and constitutional violation.

11

B. Need-Narrowness Test of the Prison Litigation Reform Act

The roots of the need-narrowness test can be found in the legislative history and the Act itself. "The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." 18 USC § 3626 (a)(1).

The needs-narrowness test is a two-part analysis that considers both the needs of the incarcerated individuals who have been injured and the least intrusive way the court can remedy the injury. The inquiry is twofold: (1) has the remedy vindicated the federal right complained of (need)? (2) Has it been achieved with the least involvement by the court in directing the details of prison operations (narrowness)? Findings under the need-narrowness test must be made before granting prospective injunctive relief. *Whitford v. Salmonsen*, 2024 U.S. Dist. LEXIS 65765.

Often, the test emphasizes the narrowness of the remedy but fails to consider the need. But the statute undeniably requires the court to

consider whether the remedy adequately "correct[s] the violation of the Federal right[.]" 18 USC § 3626(a)(1).

Here, the District Court has ordered that "Defendant must offer to each inmate who has been incarcerated for longer than a year the following: daily access to direct sunlight, weather permitting and in the absence of an emergency (including but not limited to a global pandemic or prison riot) for at least 15 minutes" (1-ER-72). Fifteen minutes of daily sunlight is woefully insufficient to remedy the violation of the federal right, particularly after enduring a year of sunlight deprivation. International guidelines and health standards have unequivocally stated that access to sunlight is necessary because "these measures have a major impact on prisoners' mental well-being as they are likely to positively influence the individual's own emotional resilience." Møller, L., Stöver, H., Jürgens, R., Gatherer, A., and Nikogosian, H. World Health Organization, *Health in Prisons: A WHO Guide to The Essentials in Prison Health* (2007). [2]  As such, these same sources have

---

[2] https://iris.who.int/bitstream/handle/10665/107829/9789289072809-eng.pdf?sequence=16&isAllowed=y

suggested that incarcerated individuals should have access to a minimum of one hour of natural sunlight each day.

For example, Rule 42 of the United Nations Standard Minimum Rules for the Treatment of Prisoners acknowledges that "access to open air and physical exercise…shall apply to all prisoners without exception." United Nations Office on Drugs and Crime, *The United Nations Standard Minimum Rules for the Treatment of Prisoners* (2015)[3]. Additionally, Rule 23 mandates that "[e]very prisoner who is not employed in outdoor work shall have at least one hour of suitable exercise in the open air daily if the weather permits." Id. The World Health Organization has also mandated that any prisoner not engaged in outdoor work should be provided at least one hour of outdoor exercise daily. Møller, supra. The National Institute for Health and Care Excellence recommends that individuals "confined indoors for long periods" should have regular access to outdoor areas to facilitate sunlight exposure for vitamin D production. National Institute for

---

[3] https://www.unodc.org/documents/justice-and-prison-reform/Nelson_Mandela_Rules-E-ebook.pdf

Health and Care Excellence, *Vitamin D: Supplement Use in Specific Population Groups* (2016)[4].

Moreover, this lack of access to sunlight is even more dangerous to people with disabilities, who are overrepresented within the U.S. correctional system population. Approximately 38% of individuals incarcerated in U.S. state and federal prisons reported having at least one disability. The most commonly reported disabilities were cognitive (23%), ambulatory (12%), and vision-related (11%). Bureau of Justice, *Disabilities Reported by Prisoners: Survey of Prison Inmates*, (2016)[5] The prevalence is even higher in state prisons, with about 40% of incarcerated individuals reporting a disability, compared to the approximately 15% disability rate in the general U.S. adult population. Prison Policy Initiative, *Disability:  Research on The Prevalence Of Comma And Challenges Faced By Comma People With Disabilities In The Criminal Legal System,* (2025)[6]

---

[4] https://www.nice.org.uk/guidance/ph56

[5] https://bjs.ojp.gov/library/publications/disabilities-reported-prisoners-survey-prison-inmates-2016

[6] https://www.prisonpolicy.org/research/disability/.

Not surprisingly, findings underscore the importance of adequate sunlight exposure for individuals with disabilities to maintain their overall physical and mental health and well-being. Limited sunlight exposure can significantly impact individuals with disabilities, particularly those who spend substantial time indoors, such as the incarcerated. Insufficient sun exposure increases risks of various physical health conditions, including cardiovascular diseases, certain cancers, and autoimmune disorders. This is particularly concerning for individuals with disabilities who may have limited outdoor access. Alfredsson, L.; et al. *Insufficient Sun Exposure Has Become a Real Public Health Problem. Int. J. Environ. Res. Public Health* 2020, *17*, 5014.[7].

Additionally, a study found that vitamin D deficiencies primarily due to insufficient sunlight exposure increases the risk of fractures and osteoporosis. Mentally speaking, nearly twice as many patients with intellectual disabilities were vitamin D deficient compared to controls. Sunlight Institute, *How Well Are You Thinking? Does Lack of Sunlight*

---

[7] https://doi.org/10.3390/ijerph17145014

16

*Lead To Intellectual Disabilities?* (2015).[8] Research also indicates that decreased sunlight exposure is associated with impaired cognitive function, especially among individuals with depression. Kent, S.T., McClure, L.A., Crosson, W.L. *et al. Effect of Sunlight Exposure On Cognitive Function Among Depressed And Non-Depressed Participants: A REGARDS Cross-Sectional Study*. Environ Health 8, 34 (2009).[9]. Finally, lack of sunlight may increase the risk of hospital admission for individuals with schizophrenia. Wang J, Wei Z, Yao N, Li C, Sun L. *Association Between Sunlight Exposure and Mental Health: Evidence from a Special Population Without Sunlight in Work*. Risk Manag Health Policy. 2023;16:1049-1057. [10]

The need-narrowness test of the Prison Litigation Reform Act exists to address the injury complained of and is written in a manner that prevents the court from unnecessarily interfering in the administration of the carceral facility. If the remedy does not address the injury at issue, then the narrowness prong isn't even reached

---

[8] https://sunlightinstitute.org/how-well-are-you-thinking-does-lack-of-sunlight-lead-to-intellectual-disabilities/
[9] https://doi.org/10.1186/1476-069X-8-34
[10] 10https://doi.org/10.2147/RMHP.S420018

because the Act's first requirement has not been satisfied. Instead the analysis must begin anew; a new, satisfactory remedy that meets the need must be provided. The courts have left the days of willfully ignoring the needs of the incarcerated in the rearview mirror with the abandonment of the "hands-off" doctrine. As such, they have a commitment to the people (incarcerated and not incarcerated) to provide remedies that genuinely address the constitutional violation rather than handing the institution an expensive but useless placebo.

## II. The District Court Abused Its Discretion Because Its Judgment is Illogical, Implausible, and Unsupported

### A. *Hinkson*

The watershed case in this Circuit's abuse of discretion jurisprudence was *United States v Hinkson*, 585 F.3d 1247 (9th Cir. 2009), which reconciled the tension between two seemingly conflicting lines of interpretation of an appellate court's review function. What *Hinkson* achieved was clarity for the factual side of the abuse of discretion standard, which was accomplished by crafting a test out of the key terms of the Supreme Court's reasoning in *Anderson v.*

18

*Bessemer City,* 470 U.S. 564, 577 (1985). That test, as formulated by this Circuit, was: "whether the district court reaches a result that is *illogical, implausible, or without support in inferences that may be drawn from the facts in the record.*" *Hinkson*, 585 F.3d at 1262 n. 21 (emphasis added).

Two features of the test are worth stressing. First, either running afoul of this fact-inference prong, or running afoul of the *de novo* "legal" prong, is sufficient for a determination of abuse of discretion. Second, within the fact prong itself, any of the test elements – illogical, implausible, or inferentially insupportable – is sufficient.[11]

In the instant case, all three terms apply because the district court's reasoning is illogical, implausible, *and* insupportable. Accordingly, an appellate finding of abuse of discretion more than amply determined. In the discussion that follows, for simplicity, we treat the logic, plausibility, and insupportable elements together.

The trial court found the Plaintiff's expert witness Dr. Czeisler credible and observed that he "opined that people need to get direct

---

[11] Nonetheless, it will often be the case that more than one of the terms apply, as e.g. the illogicality of a conclusion will *ipso facto* tend to make it implausible and unsupported.

19

sunlight every day" (1-ER-53-54; see Trial Transcript, 8-ER-1873: lines 10-13)] At trial the expert testified "My opinion, with a reasonable degree of scientific and medical certainty, is that the conditions of confinement in San Francisco County Jail that include chronic deprivation of skin exposure to natural outdoor light induce[d]" the plaintiffs "medical problems." (8-ER-1836: lines 13-16, 5, 12]. The district court found that "it accepts Czeisler's opinions on this issue and finds that the lack of direct sunlight was a causal factor in high blood pressure, diabetes, myopia, and weight gain in Plaintiffs." 1-ER-66. It also found that "there is no valid governmental interest in a complete denial of direct sunlight to Plaintiffs." 1-ER-65. The Court found a constitutional violation on grounds of reckless or deliberate "indifference." 1-ER-71. However, when it came to providing a remedy, the district court fashioned out of whole cloth two factual inferences in order to shape the remedy: first, that harm is only caused after one year of absence of direct sunlight; second, that, once the one year mark is passed, 15 minutes is enough daily sunlight to avert medical harm. 1-ER-72.

The inference of the one year delay is illogical for it combines a set of fallacies. The order seems to reason that, because no definite starting point in time has been identified as a chronic lack, therefore the time of manifestation of symptoms is the starting point of causation.[12] However, the fallacy of such an inference is a bedrock principle of everything from tort liability to the very concept of prospective equitable relief. It is well established that, for example, tobacco smoke and asbestos exposures may have health effects that manifest years later, even if the cause might be removed in the meantime. (Cf. cases cited in Opening Brief, Dkt. 8.1 at 43-44 (tobacco) and at 45-46 (asbestos)). As a specific variant of causal fallacy, we can describe the district court's reasoning as conflating causation, not with correlation, but with immediate simultaneity. This fallacy results in supposing that no harm can occur unless it is already apparent. From a common-sense perspective, this is implausible.

---

[12] "[I]t was not clear from his testimony how long a person could go without access to direct sunlight before medical harm occurred. In other words, he did not explain whether a person can live one day without access to direct sunlight and increase the risk of harm or whether a person live for one year without access to direct sunlight before medical harm occurs." 1-ER-72.

It is also implausible from a scientific perspective, as delayed appearance of signs of disease is medically common. To take one of innumerable examples that could be offered to illustrate the logic of time: "Chronic inflammation […] may follow acute inflammation […] or [it] may begin insidiously, as a low-grade, smoldering response without any manifestations of an acute reaction." Vinay Kumar et al., *Robins and Cotran Pathologic Basis of Disease*, 8th ed., Philadelphia: Saunders Elsevier (2010), at 70.[13]

The district court's 15 minutes amount also is unsupported by evidence. On the face of the order, it looks as if the judge just intuitively felt it was the right amount. The reason given is no reason at all, but a conclusory statement: "The amount of time – 15 minutes – is more than *de minimis* but less intrusive on the Defendant." 1-ER-72. Because the implied finding that 15 minutes suffices to avert harm is not based on evidence, it is an abuse of discretion.

---

[13] To be clear, the point of the inflammation example is not to suggest its diagnostic relevance to this case, but merely to indicate that slowly manifesting disease is well-recognized as a feature of medical pathology. Here, injury beings with sunlight deprivation, whose long-term consequences may take time to manifest. At the point they do manifest, the damage has been done, and the remedy is too little, too late.

B. *Doe v. Kelly*

The case of *Doe v. Kelly*, 878 F.3d 710 (9th Cir. 2017) supports Appellants' position. Although in that case, this Circuit denied the *Doe* plaintiffs' appeal for broader injunctive relief, the analysis according to which the Court did so is illuminating. The plaintiffs in *Doe* argued that the lower court's preliminary injunction against the border patrol was too parsimonious in its relief. The district court ordered sleeping mats and blankets for detainees held longer than twelve hours, rather than ordering the beds, showers, and medical care the plaintiffs sought. This Court based its decision, finding no abuse of discretion, on several features of the situation which squarely distinguish it from the instant case.

The *Doe* Court upheld the preliminary injunction's limitation to mats rather than beds because it was merely preliminary and not final relief, opining that "[e]vidence as to whether the need was likely to continue would certainly be relevant to the district court's determination of Plaintiffs' request for a permanent injunction." Id. at 23. That proposition would support, at the very least, remand in the

instant case for the consideration of further evidence addressing the timing of harm-causation and remedial effectiveness.

The *Doe* Court's analysis of shower access is instructive. Relying on *Toussaint v. McCarthy*, 597 F. Supp. 1388, 1399 (N.D. Cal. 1984), aff'd in part and rev'd in part by *Toussaint v. McCarthy*, 801 F.2d 1080 (9th Cir. 1986), the Court noted that incarcerated persons "were entitled to showers three times a week" but "case law does not compel the conclusion that they have a constitutional right to a shower when detained for fewer than two days." *Doe*, 878 F.3d at 722. Like sunlight exposure, bathing hygiene is a routine practice that prevents health problems. That courts are willing to give custodial officials leeway as to its provision on a scale of a couple of days is a far cry from the district court's judgment in the present litigation, giving the government up to a year for each and every detained person to provide sunlight. This fails the plausibility test.

Lastly, in *Doe* the Court rejected the appeal of the denial of relief as to medical care – which denial the plaintiffs alleged was an abuse of discretion -- in large part because "The record does not indicate that the existing system of medical care, as directed by the district court, is

24

inadequate." *Doe*, 878 F.3d at 724. Essentially, the Court was saying, there was no injury proven. By contrast, in the present case, the district court has found injury (supra., II.A).

Therefore, the very criteria adduced by this Court to show why there was not abuse of discretion in the border patrol detention conditions case are reasons why there *is* an abuse of discretion here.

## CONCLUSION

The injunction ordered by the district court fails to remedy the violation. Accordingly, it does not satisfy the "need" prong on which the PLRA's tailoring requirement is predicated ("necessary *to correct the violation* of the Federal right[…]" 18 U.S.C. §3626 (emphasis added)). If a prospective remedy is insufficient to correct the violation, the statute's restriction does not come into play; the tailoring restriction limits unnecessary measures, not the measures needed to correct the problem. It does not apply to measures that are clearly and facially insufficient to remedy the injury.

The district court's finding that harm is not caused until a year of absence of exposure to sunlight has transpired is an abuse of discretion.

It is illogical and implausible and unsupported by the evidence because the district court's inference commits a logical fallacy. The appearance of a symptom at a later date does not indicate that causation was inoperative in the preceding period of time. Nothing in the record supports the assumption – which is patently implausible to common sense – that the manifestation of symptoms is coextensive in time with the causal factors giving rise to the effects. Collapsing the distinction between manifestation of a harm and the causation of the harm is illogical and thus constitutes abuse of discretion.

For the foregoing reasons, *amici* support the plaintiffs' appeal.

DATE: January 10, 2025

Respectfully Submitted,

/s/   Eric C. Sapp

_____

Eric C. Sapp (SBN 240372)
Kellie Walters (SBN 342755)
LEGAL SERVICES FOR PRISONERS
  WITH CHILDREN

*ATTORNEYS FOR AMICI CURIAE*

26

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** _____24-4789_____

I am the attorney or self-represented party.

**This brief contains _____3,584_____ words,** including ____0____ words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[x] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** _s/Eric C. Sapp_____ **Date** _1/14/2025_____
*(use "s/[typed name]" to sign electronically-filed documents)*

27